

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE COLLINS & AIKMAN CORPORATION SECURITIES LITIGATION | 1:05-cv-03791 (MBM) |
| | CONSOLIDATED CLASS ACTION COMPLAINT |

**INTRODUCTION**

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon the investigation by plaintiff's counsel, for plaintiff's complaint (the "Complaint"), except for those allegations pertaining to plaintiff, which are based upon personal knowledge, alleges upon the investigation made by and through plaintiff's counsel, which included, among other things, a review of relevant public filings by Collins & Aikman Corporation ("C&A" or the "Company") with the Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports and publicly-available trading data about the Company as well as a review of reports issued by analysts who followed C&A, and papers filed in litigation concerning C&A. Plaintiff also relies on the allegations of confidential informants working with the money management firm MacKay Shields in a litigation against some of the defendants, which is currently pending in the Circuit Court of Michigan, County of Wayne. In that action, styled *MacKay Shields LLC v. Heartland Industrial Partners LP, et al.*, Case No. 05-520229, counsel for MacKay Shields has described the roles of two people, called "Confidential Informant 1" (or "CI 1") and "Confidential Informant 2" (or "CI 2"), and has pleaded allegations in that action based on their experiences and first-hand knowledge obtained while employed at C&A during the Class Period. Class counsel has spoken with counsel for MacKay Shields, and has confirmed that MacKay Shields' counsel has spoken with CI 1 and CI 2, and believes their accounts are credible. Plaintiff further

relies on consultation with experts in the area of public-company accounting and Generally Accepted Accounting Principles ("GAAP"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of all purchasers of the publicly-traded securities of C&A between May 15, 2003 and May 17, 2005, inclusive (the "Class Period"), against certain officers and directors of C&A and its majority owner, Heartland (defined below) for violations of the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act").

2.    C&A is primarily engaged in the design, engineering and manufacture of automotive interior components, systems and modules. The Company supplies products from three primary categories: plastic components and cockpits, soft trim and convertible roof systems. Its products include instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and trim set, backlights, well slings, tonneau covers and power actuating systems. Collins and Aikman employs 24,000 individuals and has a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries. Until it sought federal bankruptcy protection, C&A common stock traded under the symbol "CKC" on the New York Stock Exchange.

3.    On March 17, 2005, C&A announced that it was delaying its 2004 earnings report due to improper accounting practices related to supplier rebates, which management believed would require a restatement of the results of the first three quarters of 2004. The Company further announced that its internal investigation was ongoing and that the accounting improprieties could result in the Company restating its financial results for fiscal year 2003 as well. In particular, the Company disclosed that it conducted an internal review of vendor rebates

received from its vendors since 2002 and discovered that it had overstated revenues by approximately $12 million. The market reacted swiftly and negatively to the news: C&A's common stock fell nearly 24% from a closing price of $1.63 on March 16, 2005 to close at $1.24 on March 17, 2005, on heavy trading volume, six times the average daily volume.

4.  The state of affairs at C&A proved worse than the March 17 statements acknowledged, and a host of adverse material facts remained unrevealed on and after that date. The undisclosed problems, however, were revealed on May 17, 2005, when C&A filed for protection from creditors by declaring bankruptcy. C&A stock dropped to less than ten cents. Prices for C&A's publicly traded fixed income securities also fell precipitously, ultimately trading below $0.10 per share. The Company's 10-3/4% Notes, which had previously traded at $90, fell to just $23, a drop of 74.4%.

5.  The reported financial results (including sales, earnings and EBITA, or Earnings Before Interest Tax, Depreciation and Amortization, which is a measure of earnings designed to approximate operating cash flow), were materially false and misleading, and violated GAAP, as well as the Company's stated accounting policies. Moreover, defendants represented to the public that C&A was a successful automotive supply company, with strong financial results, while concealing that the Company's financial expectations were the results of defendants' misconduct.

6.  As set forth at length below, defendants misrepresented the Company's performance, or omitted adverse information, in several respects:

> a.  C&A's financial reporting was false, and violated GAAP, through much of the Class Period because between 2003 and 2005 C&A was improperly recognizing revenue from vendor rebate programs, including rebates created in related-party transactions that were initially undisclosed and never properly

explained during the Class Period. In fact, these vendor rebate arrangements should not have been recorded as revenue at all, but rather as reductions to cost of sales. This practice was improper and the Company has since conceded that it will have to restate prior periods.

b.    C&A's earnings and EBITDA were materially overstated during the Class Period because the Company improperly characterized ordinary expenses as capital expenses and nonrecurring items. By categorizing ordinary expenses as capital expenses the Company converted ordinary expenses to assets, and took the expenses over time as depreciation. By classifying operating expenses as non-recurring items, defendants improved their closely-followed operating figures.

c.    C&A's reported sales were materially inflated because the Company improperly recognized revenue on receivables which were not in fact due. During the Class Period, the Company pre-billed tooling receivables, and treated these as though they were eligible receivables, though the revenue had not been earned and could not properly be recognized under GAAP.

d.    C&A omitted the material fact that it was locked into a significant number of money-losing contracts, particularly with Daimler Chrysler.

e.    C&A omitted the material fact that it was grossly understaffing projects, and was deliberately deceiving major customers such as Ford to cover up for its inability to pay for the staffing required by its contracts.

f.    C&A omitted the material fact that it had such serious quality problems that it failed product approval processes over and over, finally losing significant contracts from GM as a result of its poor quality.

g.    C&A misrepresented that its Hermosillo, Mexico plant was state-of-the-art, when it was both understaffed and stocked with used equipment shipped from other locations. This situation damaged C&A's relationship with Ford, a major customer.

h.    C&A's management was warned that its internal controls were materially deficient, but it omitted this material fact and badly asserted that the Company's financial reporting procedures and process contained everything necessary to fairly and with reasonable accuracy present the Company's financial performance.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

10.    In connection with acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## THE PARTIES

### Plaintiff

11.    Plaintiff K. J. Egleston purchased C&A common stock at artificially inflated prices during the Class Period and suffered damages as shown in Plaintiff's Certification (on file with the Court) when C&A's financial condition became known to the market.

### Defendants

12.    Non-party C&A is incorporated under the laws of the State of Delaware, with its principal executive offices located at 250 Stephenson Highway, Troy, Michigan 48083.  On May 17, 2005, C&A announced that it and substantially all of its domestic subsidiaries had filed voluntary petitions to reorganize under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Michigan.  But for the protection afforded to C&A by the automatic stay provisions of the United States Bankruptcy Code, C&A would be a defendant in this action.

### The Individual Defendants

13.    Defendant Jerry L. Mosingo ("Mosingo") served as C&A's President and Chief Executive Officer until August 11, 2003.  Defendant Mosingo approved C&A's materially false and misleading press releases and signed the Company's quarterly report on Form 10-Q for the period ending March 31, 2003, which was filed with the SEC during the Class Period.

14.    Defendant David A. Stockman ("Stockman") served as C&A's Chief Executive Officer from August 11, 2003 until he was terminated on May 12, 2005; the last week of the Class Period.  Stockman has been a Director of C&A since February 2001, and Chairman of C&A's Board of Directors since August 2002. Stockman served on C&A's compensation committee from April 2002 through at least September 2004. Stockman did not receive any compensation from C&A for serving as the Company's CEO; instead, his services were provided

6

by Heartland under a services agreement which obligated the Company to pay Heartland a $4.0 million annual advisory fee and reimburse Heartland's out-of-pocket expenses related to the services it provided. According to a private placement memorandum used to sell debt securities to institutional investors in 2004 (the "PPM"), Stockman was central to C&A's operations, and the loss of his services could have a material adverse effect on the Company.

15.    Stockman was formerly a senior managing director of The Blackstone Group LP, a highly successful private equity group. Prior to joining Blackstone, Stockman was a managing director in the corporate finance department of Salomon Brothers, Inc. Before Salomon Brothers, Stockman served as the director of the Office of Management and Budget in the Reagan Administration. Stockman is the Managing Member of Heartland LLC, and is a founding partner and a Senior Managing Director of Heartland LP, which lists him as its "Buyout Partner."

16.    Defendant Stockman approved C&A's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form 10-K, and the Company's quarterly reports on Form 10-Q for the periods ending June 30, 2003 and September 30, 2004, respectively, which were filed with the SEC during the Class Period. Stockman signed C&A's Form 10-K for the Fiscal Year ended December 31, 2003. Stockman also provided certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Prided June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003, September 30, 2003 and September 30, 2004; and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

17.    Defendant J. Michael Stepp ("Stepp") served as C&A's Vice President and Chief Financial Officer ("CFO") until October 13, 2004, when he stepped down as CFO. During the Class Period, Stepp was Vice Chairman of the Company's Board of Directors. Defendant Stepp

approved C&A's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form 10-K, and the Company's quarterly reports on Form 10-Q for the periods ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, respectively, which were filed with the SEC during the Class Period. Since March 2001, Stepp has also been a Senior Managing Director of Heartland LP. Stepp signed C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003 and September 30, 2003; and C&A's Form 10-K for the Fiscal Years Ended December 31, 2003. Stepp also provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

18.    Defendant Bryce Koth ("Koth") served as C&A's CFO from October 13, 2004 through the end of the Class Period. Defendant Koth approved C&A's materially false and misleading press releases and signed the Company's quarterly report on Form 10-Q for the period ending September 30, 2004, which was filed with the SEC during the Class Period. He was previously Vice President, Finance & Controller, and head of Tax of the Company since May 2004. He joined the Company in December 2002 as Vice President, Tax. Koth signed C&A's Form 10-Q for the period ended September 30, 2004 and C&A's Form 10-Q/A for the period ended September 30, 2004. Koth also provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of the accuracy of C&A's Form 10-Q for the period ended September 30, 2004 and C&A's Form l0-Q/A for the period ended September 30, 2004. Koth resigned in the summer of 2005.

**Heartland Entity Defendants**

19.    Defendant Heartland LP is a limited partnership organized under the laws of Delaware.  Heartland LP is a $1 billion private equity firm purportedly established for the purpose of acquiring and expanding industrial companies operating in various sectors of the North America economy that are well positioned for global consolidation and growth.  Defendant Stockman is the founding partner and a Senior Managing Director of Heartland LP, and C&A Directors Timothy D. Leuliette, Daniel P. Tredwell, W. Gerald McConnell, and Samuel Valenti, III are all Senior Managing Directors of Heartland LP.  The managing general partner of Heartland LP is Heartland LLC.  C&A is one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

20.   By reason of their positions with the Company, the individual defendants had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of director meetings.   As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

21.   C&A and the individual defendants, as officers and/or directors of a publicly-traded Company, had a duty to disseminate truthful and accurate information with respect to, and to correct any public statements issued by or on behalf of, the Company that had become false and misleading.

22.   Each individual defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's securities and would cause the price of the Company's securities to become artificially inflated.   Each of the individual defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

23.    Defendant Stockman, acting on behalf of Heartland, was particularly familiar with C&A's finances and operations.  Specifically, to Confidential Informant Number 1 ("CI 1"), was a Quality Manager at a C&A plant in Canton, Ohio from March 2000 through September 2003. CI 1 stated that the carpet and acoustics division held Financial Business Operating Systems meetings, commonly known within the Company as "BOSS" meetings, approximately once a month, with Mr. Stockman participating.  Those meetings addressed the financial operations of twelve C&A plants. CI 1 attended those meetings along with Millard King, the President of the Global Soft Trim operating unit, Michael Geaghan, the Canton plant's Vice President of Operations, and Daniel Bednarz, Divisional Controller. CI 1 described Stockman as smart and numbers-oriented, with a comprehensive knowledge of each plant's financial results. Specifically, Stockman carried large binders containing each plant's financial data, and was intimately familiar with each plant's operations and finances.

24.    Confidential Informant No. 2 ("CI 2"), a former Vice President and General Manager at a C&A facility in Troy, Michigan, who was with the Company from February 2000 through December 2004, and who had direct interaction with Stockman from mid-2003 through the end of 2004, also stated that Stockman had complete mastery over C&A's finances, and that at every quarterly management meeting, Stockman recited financial information down to single digit thousands of dollars on each line of a plant's financial statements, at times even questioning CI 2 about matters as minute as the potential cost savings of replacing two security guards with cameras.

25.    Defendants Stockman and Stepp also familiarized themselves with C&A's operations in order to monitor and preserve Heartland's huge equity stake in C&A's business. As principles in defendant Heartland, Messrs. Stockman and Stepp had an incentive to (and did) closely monitor Heartland's huge investment of 33,574,772 shares of C&A (which was

approximately 30% of Heartland's assets under management). It was critically important to each of these defendants that C&A remain solvent in order to ensure the value of Heartland's investment. Moreover, as of August 2004, defendants Stockman and Stepp personally owned 150,175 and 30,067 shares of C&A, respectively.

26. Defendant Heartland, LLC is a limited liability company organized under the laws of Delaware. As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of C&A (34,314,147 shares as of January 1, 2005, and 32,714,147 shares as of March 17, 2005, exclusive of the substantial holdings of Heartland's partners and affiliates) as the general partner of several limited partnerships. During the time period relevant to this action, Heartland's ownership constituted a controlling stake in C&A and Heartland effectively controlled and operated the Company. As of January 1, 2005, Heartland owned approximately 41% of C&A's outstanding common stock, and along with Heartland's partners and affiliates, that figure was well over 50%. C&A conceded as much in the PPM which stated:

> Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors . . . In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Financial Officer, are both Senior Managing Directors of Heartland.

27. Indeed, a majority of C&A's Board (six of eleven directors) were affiliated with Heartland. Furthermore, the Company's most senior officers, defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and John A. Galente, C&A's Treasurer since October 2004, was a Vice President of Heartland LP. Stockman was not paid any compensation by C&A for serving as CEO and Chairman; rather his salary was paid directly to Heartland.

28. During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from C&A of $24.5 million, $5.7 million, $4.0 million, and $10.6 million, respectively – a total of more than $44 million.

29.    For purposes of exercising control over C&A, Heartland LP and Heartland LLC are essentially one entity.    Heartland LP employs as Senior Managing Directors defendants Stockman, Tredwell, Leuliette, and McConnell, all of whom are members of Heartland LLC and directors of C&A.    In addition, defendant Stockman, a founding partner, Senior Managing Director and "Buyout Partner" of Heartland LP, is the Managing Member of Heartland LLC, and as such has and exercises the authority to act on behalf of Heartland LLC and Heartland LP, as demonstrated by, among other things, signing SEC filings on behalf of Heartland LLC and Heartland LP.

30.    Accordingly, Heartland LP and Heartland LLC are referred to herein collectively as "Heartland."    Heartland LLC is the managing general partner of Heartland LP and, as such, exercises complete control over Heartland LP, and beneficially owns and exercises control over all of the C&A common stock held by Heartland LP.

31.    C&A, which is headquartered in Troy, Michigan, is not named as a defendant in this action because it filed a petition for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code on May 16, 2005.

32.    Because the automotive supply industry is very competitive, maintaining sufficient liquidity and working capital was critical to C&A's success. In securing new business from OEMs, C&A typically was forced to expend significant amounts of capital for engineering, development, tooling and other costs that generally were not recouped until the launch of a vehicle line, or over time based upon projected build levels.  Because C&A's business requires significant investment in its products before money is recouped, any decline in liquidity and/or working capital materially impacts C&A's ability to achieve new business and fulfill its existing contracts.

33.   Defendants are liable, jointly and severally, as direct participants in the co-conspirators of the wrongs complained of herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of C&A during the Class Period and who suffered damages (the "Class").  Throughout the Class Period, C&A's common stock actively traded on the NYSE under the ticker symbol "CKC."  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest, and the members, partners and executives of Heartland.

35.   The members of the Class are so numerous that joinder of all members is impracticable.   According to the Company's report filed on Form 10-Q with the SEC on November 17, 2004, C&A had approximately 83,630,087 shares of common stock outstanding, and tens or hundreds of millions in registered fixed income securities.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by C&A or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of C&A;

(c)   whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)   whether the market prices of the Company's securities were artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)   whether the members of the Class have sustained damages and the proper measure of such damages.

39.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

40.   On March 17, 2005, C&A issued a press release announcing a delay in filing its Annual Report on Form 10-K, and admitted that the Company had improperly accounted for $2 million in vendor rebates in 2004, thereby requiring a restatement of its results for the first three quarters of 2004 and perhaps for fiscal year 2003.  C&A further announced that the Company's audit committee had retained the law firm of Davis Polk & Wardwell LLP to assist with the ongoing investigation.

**Pre-Class Period Events:  Related Party Transactions and Heartland's Activities**

41.   The events from 2001 through the beginning of the Class Period are important as prologue to the fraud committed during the Class Period.  Defendant Heartland acquired total control over C&A in 2001, and proceeded to cause C&A to enter into a series of transactions. Several of these transactions involved purchasing companies owned by Heartland's partners; while others produced lucrative advisory fees to Heartland.   In all, from the time Heartland gained control of C&A through the early part of the Class Period, Heartland removed more than $300 million from C&A.

42.   Before the Class Period, C&A also took steps to accelerate its cash flow, making its financials look stronger.  C&A then, in June 2002, attempted to sell stock to the public in a secondary offering.  C&A was unable to complete the offering, and as set forth in this section, it was left in a cash-strapped position with mounting problems.  Throughout the Class Period, the defendants misrepresented C&A's performance and concealed its troubles because C&A needed to find a way to finance itself and survive the damage done in the aftermath of Heartland's takeover.  Ultimately, C&A did sell over $400 million in debt securities and secure other credit arrangements during the Class Period, but even these arrangements were not enough to rescue it from the effects of the earlier damage.  When Heartland's true performance was revealed and its

true operating difficulties could no longer be concealed, C&A was forced to first announce that its financial results could not be relied upon, and then to seek bankruptcy protection.

43. C&A's 2001 Form 10-K stated: "During the first quarter of 2001, Heartland acquired a controlling interest in the Company." Control by Heartland was evidenced by the fact that the following individuals were placed on the Board of C&A in conjunction with Heartland's acquisition of 59.7% of the Company's common stock in February 2001:

(a) Defendant Stockman, CEO during most of the Class Period, and a senior managing director and the founder of Heartland.

(b) Defendant Stepp, CFO during much of the Class Period and a senior managing director of Heartland.

(c) Timothy D. Leuliette, a senior managing director and one of the co-founders of Heartland.

(d) Daniel P. Tredwell, a senior managing director and a co-founder of Heartland.

(e) W. Gerald McConnell, a senior managing director of Heartland since its founding.

(f) Cynthia L. Hess, a senior managing director of Heartland.

(g) Samuel Valenti, a senior managing director of Heartland.

44. Heartland's control was clearly apparent as set forth in C&A's April 20, 2001 Proxy on Form DEF 14A as follows: "As of March 15, 2001, Heartland and its affiliates, Blackstone Partners and its affiliates and the Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 91% of the outstanding Common Stock."

45. From the outset, Heartland began extracting huge sums from C&A, as evidenced by the following discussion in C&A's 2001 Form 10-K:

> The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.
>
> **Under the services agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, it paid Heartland a fee of $12.0 million and reimbursed it for its reasonable out-of-pocket expenses incurred in connection with its initial investment. A fee of $12.5 million was paid by the company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition**. (Emphasis added.)

46. Within weeks of gaining control of C&A and functioning as advisor "in connection with acquisitions," Heartland caused C&A to acquire Becker Group LLC. Becker, the individual behind Becker Group LLC, was directly or indirectly a Heartland limited partner (according to a March 11, 2004 press release). Following the late Class Period firing of Stockman on May 12, 2005, Becker was appointed CEO of C&A.

47. On May 15, 2001, C&A filed its Form 10-Q for the quarterly period ended March 31, 2001 with the SEC. This document stated, in relevant part:

> The Company announced on March 21, 2001 that it had signed a letter of intent to acquire the Becker Group LLC ("Becker"), a supplier of plastic components to the automotive industry, with fiscal 2000 sales of approximately $235 million. Under terms of the letter, the Company would acquire all of the equity interests of Becker. The owners of Becker would receive 17 million shares of the Company's common stock and a three year warrant for 500,000

17

shares at an exercise price of $5.00 per share. In connection with the acquisition, approximately $60 million of debt of Becker would be repaid and, to the extent debt balances are less than $60 million, the sellers would receive cash for the difference. **The three individual sellers would be required to enter into non-compete agreements that would provide for aggregate payments to them over five years totaling $18 million.** Completion of the transaction is subject to certain terms and conditions, including negotiation of definitive documentation, and it is expected to close during the second quarter of 2001.  (Emphasis added.)

48.    On July 5, 2001, C&A issued a press release announcing it had completed its acquisition of the Becker Group, LLC.  The press release stated:

> **As previously indicated, consideration included $60 million in cash, an $18 million non-compete agreement (to be paid out over five years)**, 17 million shares of C&A common stock and warrants for 500,000 shares at an exercise price of $5.00 per share. . . Chuck Becker, former principal and owner of Becker, has joined C&A's Board of Directors as Vice Chairman.  (Emphasis added.)

49.    A Form 8-K which was filed with the SEC on July 13, 2001 contained a copy of the Agreement and Plan of Merger (dated as of May 14, 2001).  It defined the "Non-Compete Agreement" as "the non-compete agreement by and between Purchaser [C&A] and each of Becker, McInerney and Hohnel" and stated that: "**Each Seller shall have entered into a Non-Compete Agreement with Purchaser for an aggregate payments to all Sellers of $18,000,000 ratably over five years**, and each such agreement shall be in full force and effect." (Emphasis added.)

50.    Thus, according to the Agreement And Plan Of Merger, Becker, McInerney and Hohnel had agreed to honor the terms of a non-compete agreement in exchange for the payment of $18,000,000 over five years, or $3,600,000 per year for five years.  As subsequently disclosed in the Company's September 17, 2001 Form 8-K/A, the $18 million was to be paid solely to Becker:

> The consideration for the acquisition included an aggregate of 17 million shares of common stock of the Company and warrants to

18

purchase 500,000 shares of common stock of the Company at an exercise price of $5.00 per share, $60.0 million in cash and **an $18.0 million non-compete agreement with Charles E. Becker to be paid out over five years**.  (Emphasis added.)

51.    On August 7, 2001, C&A announced that it had signed a definitive agreement with Textron, Inc. ("Textron") to acquire its automotive trim division ("TAC-Trim"), a leading supplier of fully-integrated cockpits, with 2000 reported sales of approximately $1.9 billion.  As stated in the Company's September 30, 2001 Form 10-Q: "TAC-Trim is a major automotive plastics manufacturer in North America, Europe, and South America for instrument panels, interior trim and exterior components. Its global reach extends to 38 manufacturing facilities located in nine countries. TAC-Trim's workforce numbers approximate 12,900 employees." The transaction closed on December 20, 2001.  Heartland received a $12.5 million advisory fee in connection with this transaction.

52.    Various documents filed with the SEC also disclosed that during 2001 Heartland and its affiliates extracted cash from C&A as follows:

(h)    $12.0 million (plus reimbursed for out-of-pocket expenses) to Heartland in 2001 in connection with its initial investment in C&A.

(i)    $100.0 million to Elkin McCallum ("McCallum") and his affiliates in 2001 in connection with the acquisition of Joan Automotive Industries, Inc. and Western Avenue Dyers, L.P.  McCallum, like Becker before him, was directly or indirectly a limited partner of Heartland.  McCallum was "directly or indirectly" a limited partner "in Heartland, the company's largest shareholder", according to a March 11, 2004 press release.

(j)    $61.8 million to Becker and affiliates in 2001 in connection with the acquisition of Becker Group, LLC (Becker was "directly or indirectly" a limited partner "in Heartland, the company's largest shareholder", according to the March 11, 2004 press release).

(k)      $12.5 million to Heartland in 2001 as a result of its advisory services in connection with the TAC-Trim acquisition.

53.   Heartland earned $300 million from compelling C&A to do deals with investors in Heartland, or deals which benefited Heartland as an advisor.

54.   Major auto makers historically paid their suppliers' invoices 60 days after receipt (Detroit Free Press, February 3, 2005; Crain's Detroit Business, November 8, 2004).  From time to time, suppliers who needed to accelerate their cash flow for specific business reasons engaged in arrangements with financial institutions whereby their receivables (invoiced amounts) were converted to cash immediately at a discount.  C&A, however, used such arrangements on a regular basis.  In using these "factoring-type" arrangements, C&A sacrificed long-term cash flow for immediate cash.  As discussed in GAAP (FASB Statements No. 125 and 140):

> Factoring arrangements are a means of discounting accounts receivable on a no recourse, notification basis.  Accounts receivable are sold outright, usually to a transferee (the factor) that assumes the full risk of collection, without recourse to the transferor in the event of a loss.  Debtors are directed to send payments to the transferee.

55.   During March 2002, C&A entered into an accelerated customer payment program ("fast pay program") for the collection of accounts receivables from two of its larger customers (June 11, 2002 Registration Statement and Prospectus).  Pursuant to this program, C&A was able to increase its cash receipts by receiving early payment on receivables.

56.   According to a November 8, 2004 Crain's Detroit Business article, General Electric Capital Corporation ("GECC") implemented a factoring-type of program (sometimes referred to as GECC's "fast pay program" or "accelerated payment program") whereby GECC would, upon issuance of an invoice by a supplier to General Motors Corp., Ford and the Chrysler Group:

(l)    purchase the supplier's newly created receivable from the supplier at a discount, after obtaining assurance (a guarantee) from General Motors Corp., Ford or the Chrysler Group that the receivable was valid and that it would be paid in 60 days.

(m)    pay the supplier the discounted amount within ten days.

(n)    collect the full invoice amount from General Motors Corp., Ford or the Chrysler Group after 60 days.

57.    Having obtained a new source of increased liquidity in the "fast pay program", the defendants once again wasted no time funneling additional funds to insiders.  By year end 2002, C&A had utilized its "fast pay program" to mortgage its future cash flow to the tune of $98 million (according to a February 20, 2003 conference call).  A substantial portion of this $98 million found its way into the pockets of the individual defendants.

58.    On April 12, 2002, C&A acquired from McCallum, a lamination company that was wholly owned by McCallum (a Heartland limited partner).  As consideration in the transaction, McCallum received 400,000 shares of C&A common stock, $2.5 million in cash, and $6.7 million in payment of debt. In addition, during 2002, "entities controlled by Mr. McCallum" received $57.8 million "for goods and services purchased", and Becker received $300,000.00 "as compensation... for his temporary service as Vice Chairman of C&A."

59.    In June, 2002, C&A filed a registration statement for a follow-on offering of 16 million shares of common stock.  This would have financed a buyback of securities issued in the TAC-Trim acquisition, and would have provided cash for general corporate purposes.  However, C&A was unable to complete the offering.

60.    By the beginning of the Class Period, Heartland had withdrawn huge sums of cash from C&A, and the Company had damaged its long-term performance with money-losing contracts and factoring agreements that accelerated its cash flow.  Having failed to sell more

stock to the public, the defendants had to and did conceal C&A's increasing performance problems while they searched for a strategy to either turn the Company around or shield themselves from the effects of its collapse.

## CLASS PERIOD EVENTS AND FALSE STATEMENTS

61.    On May 15, 2003, the Company issued a press release regarding its financial results for the first quarter of 2003.  The press release stated in pertinent part:

> TROY, Mich. - C&A Corporation (C&A) (NYSE:CKC) today announced mixed results for its first quarter - with record sales and significant future year new business wins accompanied by a disappointing decline in profitability. According to Jerry Mosingo, C&A President and CEO, "First quarter 2003 sales of $1.035 billion represented an increase of $120 million or 13 percent over 2002 first quarter sales of $915 million."

> The company reported first quarter 2003 operating income of $17.4 million, a net loss from continuing operations of $28.7 million or 34 cents per share, and EBITDA of $50.8 million.  These results compared to operating income in the first quarter of 2002 of $54.4 million, a net loss from continuing operations of $6.7 million or 10 cents per share, and EBITDA of $84.9 million.  The first quarter 2003 results include $18.1 million in charges for the impairment of long-lived assets and the first quarter 2002 results include $9.1 million of restructuring charges.

> \*\*\*\*\*

> The first quarter 2003 impairment of long-lived assets included a $10.4 million write-off of a non-compete agreement. . .

62.    C&A's financial results for the first quarter of 2003 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2003, which was signed by defendants Mosingo and Stepp.  That Form 10-Q disclosed substantially the same financial data as was contained in the May 15, 2003 press release.  It also stated:

> The condensed consolidated financial statements include the accounts of the Company and its subsidiaries.  In the opinion of management, **the accompanying condensed consolidated financial statements reflect all adjustments, including**

> **adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operation.** Certain prior year items have been reclassified to conform to the 2003 presentation. (Emphasis added.)

63.    These financial results reported by Mr. Mosingo and by C&A were materially false and misleading. As described below, sales were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 141 - 142); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 143 - 145).

64.    In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments. C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 171 - 178). C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers. CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 155 - 160). C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

65.    The disclosure about a non-compete agreement was materially false and misleading because it omitted further substantial information about related-party transactions (described below at ¶¶ 87, 89) which were necessary to make it not misleading.

66.    The May 15, 2003 press release was silent as to vendor rebates except for one sentence:  **"a non-recurring rebate" was "received in the first quarter of 2002."**  (Emphasis added.)  This was misleading because it failed to disclose how the rebate was recorded, and because the rebate in fact was improperly recorded and inflated several financial measurements, as set forth above.

67.    Discussing the Becker non-compete agreement, the March 31, 2003 Form 10-Q stated:

> On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the Company's Board of Directors.  The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement was entered into as part of the Becker acquisition. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

68.    This disclosure was materially false and misleading because it omitted further substantial information about related-party transactions.  C&A partially disclosed the details of these transactions on March 11, 2004 (See below ¶¶ 87, 89).  However, both this and that disclosure were misleading because C&A failed to disclose that the related party transactions with Becker and his affiliates resulted in the improper recording of vendor rebates as revenue, an impropriety that requires restatement.

69.    The March 31, 2003 Form 10-Q contained certifications pursuant to Section 906 of the Sarbanes Oxley Act ("Section 906 certification") executed by defendants Mosingo and Stepp.  These certifications stated:

24

> Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Quarterly Report on Form 10-Q for the period ended March 31, 2003 of C&A Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

70.   In addition, the March 31, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations."  In fact, the financial results were known by defendants Mosingo and Stepp and by C&A to be materially false and misleading at the time.

71.   On August 11, 2003, the Company announced the appointment of Defendant Stockman as Chief Executive Officer.  Defendant Mosingo resigned as President, Chief Executive Officer and a Director of the Company.

72.   On August 15, 2003, C&A issued a press release announcing financial results for the second quarter ended June 30, 2003.  It stated, in relevant part:

> C&A Corporation (C&A) (NYSE: CKC) today reported second quarter and year-to-date results for the six months ended June 30, 2003. For the second quarter 2003, the company reported earnings per share of 13 cents from continuing operations versus a loss of 46 cents for the same period of 2002. The company reported second quarter 2003 sales of $1.034 billion and operating income of $43.5 million, which includes restructuring and asset impairment charges of $5.7 million. On a comparable basis for the second quarter 2002, C&A reported sales of $1.085 billion and operating income of $81.5 million. The company's independent auditors have not completed their review of these second quarter financial results, as discussed below. Commenting on the company's improved second quarter results, David Stockman, C&A Chairman and recently appointed CEO, stated, "Despite difficult market conditions which caused vehicle builds to decline considerably versus last year, **our employees pulled together and delivered on most facets of the**

25

**operations including program launches, cost containment and performance improvement.** But I think we can still do better. The EBITDA margin achieved in the second quarter is far from satisfactory considering our net capital employed and extensive vertical integration."  (emphasis supplied)

73.  On August 15, 2003, the Company filed its Form 10-Q for the quarterly period ended June 30, 2003 with the SEC ("the June 30, 2003 Form 10-Q"). This document, signed by defendant Stepp, disclosed substantially the same financial data contained in the August 15, 2003 press release (and these were materially false and misleading for the same reasons), and it contained a disclosure regarding termination of the Becker non-compete agreement, which was substantially similar to the disclosure which was contained in the March 31, 2003 Form 10-Q.  It was silent with regard to vendor rebates except to refer to an undisclosed sum of "rebates received in the six months ending June 30, 2002."

74.  The June 30, 2003 Form 10-Q disclosed the existence of certain unspecified accounting-related assertions "**made by two former executives of the Company**" (emphasis supplied) regarding "transactions between the Company and affiliates of Elkin McCallum" and "issues concerning the original acquisition of Becker Group by the Company from certain persons, including Charles E. Becker, presently a director of the Company."  The disclosure stated:

> The Company was recently advised of assertions concerning certain related party transactions and other matters described below. The Audit Committee was promptly advised of these assertions and determined to thoroughly investigate them. The Audit Committee has retained an independent counsel for that purpose, and the Audit Committee investigation is underway. The Company has been advised by its independent auditors, KPMG LLP, that they will be unable to complete their SAS 100 review of the Company's second quarter results prior to completion of the Audit Committee's independent investigation. Accordingly, the Company's independent accountants, KPMG LLP, have not reviewed the accompanying unaudited consolidated financial statements as June 30, 2003 and for the three month period then

ended in accordance with Rule 10-01(d) of Regulation S-X promulgated by the SEC.

**The assertions were made by two former executives of the Company**. Based on the initial work of the Audit Committee, the Company believes that the principal assertions relate to (1) a concern with certain terms of previously disclosed transactions between the Company and affiliates of Elkin McCallum, a director of the Company, and a related potential accounting implication for one of these transactions and (2) non-accounting related issues concerning the original acquisition of Becker Group by the Company from certain persons, including Charles E. Becker, presently a director of the Company. In addition, based on the former employees' communications, the Audit Committee is expected to review the management environment, including that of the finance staff. (Emphasis added.)

75.    The June 30, 2003 Form 10-Q contained Section 906 certifications by defendants Stockman and Stepp. In addition, the June 30, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations." This was materially false and misleading, as Messrs. Stockman and Stepp were aware of the accounting improprieties and the undisclosed adverse information described in the preceding paragraphs when these statements and certifications were made.

76.    On November 13, 2003, the Company issued a press release entitled "C&A Announces Improved Third Quarter Financial Results," regarding its financial results for the third quarter of 2003. The press release stated in pertinent part:

Collins and Aikman Corporation today reported third quarter and year-to-date results for the nine months ended September 30, 2003. For the third quarter, which is the company's seasonally weakest quarter, the **company reported net sales of $902 million** compared to $923 million in the third quarter of 2002, a 2% decline which mainly reflected reduced North American customer build volumes. The company also reported a loss of 38 cents per share from continuing operations versus a loss of 54 cents per share in the same period in 2002. The third quarter results included after-

tax charges for restructuring and long-lived asset impairments of $16.0 million (or 19 cents per share) and $21.4 million (or 26 cents per share) in 2003 and 2002, respectively.

**EBITDA was $41.9 million for the third quarter of 2003 as compared to $21.8 million for the third quarter of 2002. The third quarter 2003 EBITDA was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets.** Results for the third quarter of 2002 included pre-tax charges of $25.1 million for restructuring and $8.7 million for the impairment of long-lived assets. (Emphasis added.)

77. C&A's financial reports were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons stated herein. As described below, sales were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142). As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

78. In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments. C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175). C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers. CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157). C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically

delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

79.    On November 14, 2003, the Company filed its Form 10-Q for the quarterly period ended September 30, 2003 with the SEC ("the September 30, 2003 Form 10-Q"). This document, signed by defendant Stepp, disclosed substantially the same financial data as was contained in the November 13, 2003 press release (and was false for the reasons stated in the preceding paragraphs). It was silent with regard to vendor rebates and it contained a disclosure regarding termination of the Becker non-compete agreement which was substantially similar to the disclosure which was contained in the June 30, 2003 Form 10-Q. It should have disclosed that vendor rebates from related party transactions had been improperly booked and required restatement.

80.    The September 30, 2003 Form 10-Q contained Section 906 certifications by defendants Stockman and Stepp. In addition, the September 30, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations."

81.    The September 30, 2003 Form 10-Q, including the Section 906 certifications which were signed by defendants Stockman and Stepp, was materially false and misleading for the reasons stated above, and more fully explained below. This was materially false and misleading, as Messrs. Stockman and Stepp were aware of the accounting improprieties and the undisclosed

adverse information described in the preceding paragraphs when these statements and certifications were made.

82.   On February 17, 2004, the Company reported that it closed on a syndication of a material financing facility:

> Collins and Aikman Corporation announced today that the company on Friday, February 13, 2004 closed on its syndication of a $100 million Supplemental Revolving Credit Facility and a $185 million Tranche A-1 Term Loan.  The Supplemental Revolving Credit Facility will be available for revolving credit loans and letters of credit.  The proceeds of the Tranche A-1 Term Loan will be used to further improve liquidity by voluntarily prepaying the existing two term loans in forward order of maturity and will also reduce the applicable interest rate margins.  Other terms and conditions are substantially the same as the existing facilities and term loans.  These financings mature on December 31, 2005.  J.P. Morgan Securities, Inc. and Deutsche Bank Securities, Inc. served as Joint Bookrunners and Lead Arrangers for these transactions.

83.   Because the Company had failed to sell its stock to the public in 2002 and because its financial problems (described in ¶¶ 41 – 60, 151 – 185) left it cash-starved, this and other financing arrangements were critical to C&A's survival.

84.   On March 11, 2004, C&A filed a press release entitled "Collins & Aikman Announces Record Sales and Fourth Quarter Financial Results," announcing record financial results for the fourth quarter and year-end Fiscal Year 2003.  Specifically, the Company reported net sales of $1.013 billion in the fourth quarter of Fiscal Year 2003, as compared to $963 million in the fourth quarter of 2002, a 5% increase.  The Company further reported a loss of $0.14/share from operations in the fourth quarter of 2003, which included after-tax charges for restructuring and long-lived asset impairments of $16.7 million (or 20 cents per share), compared to a loss of $0.04 cents per share in the comparable period in 2002, which included after-tax charges for restructuring and long-lived asset impairments of $13.0 million (or 16 cents per share).  The press release elaborated on the Company's financial results as follows:

The fourth quarter 2003 pre-tax restructuring charge of $13.8 million included costs associated with the previously announced third quarter restructuring actions that would reduce the Company's salaried workforce by almost 800 or 15%. This restructuring initiative and related actions are expected to reduce the company's fixed-cost structure by $80 million per year.

**For the full-year 2003, the company reported sales of $3.98 billion compared to $3.89 billion in the same period of 2002.** The company also reported a net loss available to common shareholders from continuing operations of $59.1 million or 71 cents per share, which included $49.9 million (or 60 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2002 period, the net loss available to common shareholders from continuing operations was $87.6 million of $1.15 per share, which included after tax charges for restructuring and long-lived asset impairments of $40.9 million (or 53 cents per share).

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.346 billion at December 31, 2003. (Emphasis added.)

*****

EBITDA was $69.4 million for the fourth quarter of 2003, which was reduced by charges of $13.8 million for restructuring and $7.3 million for the impairment of long-lived assets. The fourth quarter 2003 EBITDA was $68.2 million, which was reduced by charges of $4.8 million for restructuring and $9.3 million for the impairment of long-lived assets.

85.    These financial results, reported by C&A, were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons stated herein. As described below, sales were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142). As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

31

86.    In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments.    C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175).   C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers.   CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157).   C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on.   These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts.   C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157).   C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

87.    This press release also discussed the Company's Audit Committee findings:

> As separately announced today, the company's Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. **The Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures.**   The primary findings of the Audit Committee include that (1) it did not become aware of any events that would necessitate a restatement of any previously issued financial statements and (2) that all related party transactions had a legitimate business purpose, were negotiated fairly, and were intended to advance the interests of the company and not to benefit the related parties at the company's expense. The Audit Committee, however, has made certain corporate governance

and disclosure recommendations concerning related party transactions that are summarized in the company's separate press release.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, no restatement of any previously issued financial statements is required or being made. The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley.  (Emphasis added.)

88.   This was materially false and misleading.  C&A purported to have had its audit committee review its accounting for revenue and tooling, and its related party transactions. However, C&A did not then report that it was wrongly reporting vendor rebates as revenue, and in impermissible periods (¶¶ 138 – 139), practices which C&A admits require restatement. Further, C&A did not disclose that the vendor rebate issue implicated the related party transactions.

89.   A second press release issued by C&A on March 11, 2004 disclosed a previously undisclosed (in violation of federal securities laws) $300,000.00 payment to Becker in 2002 "as compensation...for his temporary service as Vice Chairman" of the Company during that year. It also stated that disclosures concerning a "description of the 2003 fabrics transactions with Mr. McCallum and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements" would be forthcoming.  The press release stated:

Collins & Aikman Corporation (NYSE: CKC) announced today that its Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the company's full Board of Directors. In general, **the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review**

**of related party transactions** and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

o      The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

o      While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the company, on the one hand, and Heartland Industrial Partners, Mr. McCallum and Mr. Becker and their respective affiliates. **Both Mr. Becker and Mr. McCallum are directors and significant shareholders of the company and are, directly or indirectly, limited partners in Heartland, the company's largest shareholder.**

The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the company and not to benefit the related parties at the company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the Board of Directors of the company, were properly documented and **adequately disclosed.**

The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. After Board discussion with the Audit Committee on March 10, 2004, the Board has scheduled a meeting prior to the filing of its Annual Report on Form 10-K to formally review and consider ratification of these matters. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously

Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum.

The Audit Committee also recommended that the company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. This resolution will also be considered at the next Board meeting.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, **no restatement of any previously issued financial statements is required or being made.** The company also expects to enhance the disclosure in its Form 10-K for 2003 with respect to the recommended matters. The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley. **The enhanced disclosure is expected to include (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the company during that year, (2) an improved description of the 2003 fabrics transactions with Mr. McCallum and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.** (Emphasis added.)

90.    The foregoing press release was materially false and misleading because the related party transactions were not adequately disclosed, and because previously issued financial statements were required to be restated due to malfeasance in areas that C&A purported to have closely reviewed.  Especially critical, though the press release discloses for the first time that these related party transaction involved rebate arrangements, the press release did not disclose how the rebates were recorded.  In fact, they were recorded improperly as revenue, in the periods received, instead of over time as a reduction to cost of goods sold as required by GAAP.

91.    On March 17, 2004, C&A filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2003, which was signed by defendants Stockman and Stepp. The 2003 10-K repeated and reaffirmed the same materially false and misleading financial information that was contained in the March 11, 2004 press release.  In the Form 10-K for the year 2003, C&A also reported its full-year 2003 results, including net sales of $3.983 billion, gross profit of $444.2 million, and operating income of $102.0 million.

92.    Mr. Stockman and C&A reported these results, which were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons stated herein, including the improper recording of rebates from vendors, premature billing of invoices and mischaracterization of operating expenses.  As described below, sales were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142).  As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

93.    In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments.  C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175).  C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers.  CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157).  C&A had such bad quality problems (as a result

of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

94.     The Form 10-K further stated that:

> The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reporting period. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates. Certain of the Company's more critical accounting estimates are described below.
>
> *****
>
> As of the end of the period covered by this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer, the Certifying Officers," evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, **the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management,** including its Certifying Officers, as appropriate to allow timely decisions regard required disclosure. In addition, the Certifying Officers also disclosed to the Company's

auditors and the audit committee of the Board of Directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

b. Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2003. The following paragraphs detail management's significant areas of focus to further enhance internal controls: Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements. (Emphasis added.)

95.    The 2003 Form 10-K disclosed that previously undisclosed vendor rebates had been received from related parties during 2002 and during 2003, and that these rebates materially impacted the Company's reported earnings and margins during 2002 and 2003. In addition, the 2003 Form 10-K disclosed the existence of certain other previously undisclosed related party transactions as follows:

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. **The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased**. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. **Supplier rebates such as these are common in the automotive industry** as part of ongoing price negotiations and adjustments. These **rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements**. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002. (Emphasis added.)

96.   As subsequently disclosed (in the March 31, 2004 Form 10-Q), the **$1.2 million of rebates** which were received from entities controlled defendant McCallum in 2003 were recognized as income in the first quarter of 2003. The $1.2 million was material to the reported 2003 first quarter operating income of $17.4 million.

97.   The 2003 Form 10-K continued to conceal the truth.  Significantly, although the 2003 Form 10-K stated that supplier rebates "are common in the automotive industry", the accounting policy followed by the Company in accounting for these rebates were not disclosed in the Company's financial statements in contravention of GAAP (APB Opinion No. 22).  In fact, they were improperly recorded for the reasons stated above and more fully explained below, and C&A has conceded the need to restate its financials due to improper recording of vendor rebate arrangements.

98.   The 2003 Form 10-K a contained certification pursuant to Section 302 of the Sarbanes-Oxley Act (Section 302 certification) by defendants Stockman and Stepp.  It stated:

1.   I have reviewed this Annual Report on Form 10-K of C&A Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

99.    The 2003 Form 10-K, including the certifications which were signed by defendants Stockman and Stepp, was materially false and misleading for the reasons stated above and explained more fully below. This was materially false and misleading, as Messrs. Stockman and Stepp were aware of the accounting improprieties and the undisclosed adverse information described in the preceding paragraphs when these statements and certifications were made.

100. On May 6, 2004, C&A issued a press release entitled "Collins & Aikman Announces First Quarter Financial Results And Record First Quarter Sales," announcing its financial results for the first quarter of 2004, the period ending March 31, 2004. More specifically, the Company reported:

> **The company reported record first quarter net sales in 2004 of $1.066 billion compared to $1.035 billion in the first quarter of 2003,** a 3% increase which mainly reflects improved currency impact. The company reported a loss of $23.3 million or 28 cents per share in the first quarter of 2004, which included after-tax charges for restructuring, long-lived asset impairments and costs related to early extinguishment of debt of $10.6 million (or 13 cents per share).
>
> In the comparable 2003 quarter, the company had a loss of $26.2 million or 31 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $13.2 million (or 15 cents per share).
>
> Commenting on the company's first quarter operating results, David A. Stockman, C&A Chairman and CEO stated, **"We are pleased with the significant performance improvement in EBITDA before restructuring and impairment charges. For the third consecutive quarter our EBITDA results were up double digits from the prior year on a comparable basis.** We are also seeing our previous problem plants turning around their financial results from the 2003 levels."
>
> The first quarter 2004 pre-tax restructuring charge of $9.5 million included costs associated with additional rightsizing efforts to reduce corporate overhead and salaried headcount and to close additional manufacturing facilities. This restructuring initiative is expected to **further reduce the company's fixed-cost structure** by approximately $13 million when fully implemented. C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.432 billion at March 31,2004. (Emphasis added.)

101. Mr. Stockman and C&A reported these results, which were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons stated herein, including the improper recording of rebates from vendors, premature billing of invoices and mischaracterization of operating expenses. As described below, sales

were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142). As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

102. In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments. C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175). C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers. CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157). C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

103. The May 6, 2004 press release also stated that "Charles Becker and Elkin McCallum have resigned as directors of the company effective as of May 6, 2004."

104.  On May 7, 2004, the Company filed its Form 10-Q for the quarterly period ended March 31, 2004 with the SEC ("the March 31, 2004 Form 10-Q"). This document, which was signed by defendant Stepp, contained financial information which was substantially identical to the financial information that was contained in the May 6, 2004 press release.  It did not disclose the Company's accounting policy with regard to rebates (without which it was misleading), although it provided certain information concerning related party rebates as follows:

> In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships.  **The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $1.3 million for the quarter ended March 31, 2004, and $5.4 million (net of $1.2 million of rebates) for the quarter ended March 31, 2003 for goods and services purchased.** The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. **In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $3.4 million for the quarter ended March 31, 2004 and $3.3 million for the quarter ended March 31, 2003.**
> (Emphasis added.)

105.  This disclosure was misleading.  C&A has conceded that its treatment of vendor rebates was improper.  The proceeding disclosure did not alert investors that the related party transactions involved improperly recorded items that rendered C&A's financial reporting false and violative of GAAP.

106.  C&A's financial results for the first quarter of 2004, the period ending March 31, 2004, were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 7, 2004, which was signed by Defendant Stepp.  That Form 10-Q also stated:

> The condensed consolidated financial statement include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations.

107. The March 31, 2004 Form 10-Q disclosed that Heartland continued to extract huge sums from C&A by arranging for C&A to pay Heartland an additional $6 million.

108. In this regard, C&A's 2001 Form 10-K stated that the services agreement with Heartland called for Heartland to provide "advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise."  The March 31, 2004 Form 10-Q stated:

> . . .the Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of **the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility** to add a supplemental revolving credit facility. On May 6, 2004, the Company's Board of Directors, including the disinterested and independent directors of **the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the expected notes offering** and a fee of 1% of the gross proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facility.  (Emphasis added.)

109. On August 2, 2004, C&A issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004.  More specifically, the Company, in its press release, stated:

> **The company reported record second quarter 2004 net sales of $1.036 billion.**  The company reported a loss of 35 cents per share in the second quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments of $26.0 million (or 31 cents per share).  In the comparable 2003 quarter, the company

had income of 13 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $4.4 million (or 5 cents per share).

Commenting on the company's second quarter operating results, David A. Stockman, C&A Chairman and CEO, stated, **"For the fourth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges was up significantly from the prior year on a comparable basis.** The savings from the restructuring program that began in the third quarter of 2003 is resulting in significant fixed cost savings as indicated by our year-over-year decline in selling, general and administrative expenses."

The second quarter 2004 pre-tax restructuring charge of $10.4 million included costs associated with additional actions to right size its overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $11 million when fully implemented. During the second quarter 2004, the company recognized $27.4 million of impairments of long-lived assets primarily related to $13.6 million of Intellimold assets and $11.0 million of customer contracts as a result of changes in customer sourcing.

**For the six months ended June 30, 2004, the company reported sales of $2.103 billion compared to $2.069 billion for the comparable period of 2003.** The company also reported a net loss of $53.0 million or 63 cents per share, which included $35.6 million (or 43 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2003 period, the net loss was $15.5 million or 19 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $17.2 million (or 21 cents per share). (Emphasis added.)

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.439 billion at June 30, 2004.

110. Mr. Stockman and C&A reported these results, which were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons stated herein, including the improper recording of rebates from vendors, premature billing of invoices and mischaracterization of operating expenses. As described below, sales were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly

45

recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142). As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

111. In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments. C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175). C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers. CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157). C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

112. On or about August 3, 2004, the Company filed its Form 10-Q for the quarterly period ended June 30, 2004 with the SEC ("the June 30, 2004 Form 10-Q"). This document, which was signed by defendant Stepp, contained financial information which was substantially

identical to the financial information that was contained in the August 3, 2004 press release (and was false for the reasons stated in the preceding paragraphs). It did not disclose the Company's accounting policy with regard to rebates. However, it repeated the information quoted in ¶ 95, above, concerning rebates received from related parties. These disclosures were materially false and misleading because C&A did not disclose that the rebates received from related parties were improperly recorded, or that C&A's improper recording of vendor rebates resulted in financial reporting which would later have to be restated.

113. The June 30, 2004 Form 10-Q contained Section 906 certifications by defendants Stockman and Stepp. In addition, the June 30, 2004 Form 10-Q contained a representation which stated: "The consolidated financial statements...in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations." This was materially false and misleading, as Messrs. Stockman and Stepp were aware of the accounting improprieties and the undisclosed adverse information described in the preceding paragraphs when these statements and certifications were made.

114. That same day, C&A held a conference call for institutional investors. During this conference call, defendant Stockman again emphasized C&A's EBITDA and represented that C&A was succeeding in spite of difficult market factors:

> I am pleased to report that we have now had our fourth straight quarter of very strong EBITDA gains in both dollars and margins. . . [W]e came in at $100.4 million before restructuring and impairment charges, in line with our expectations. This represents a 20 percent increase over the prior year, so we are making demonstrable progress. This also comes in light of some of the headwinds that we've had to push against, such as upward pressure on commodity costs and downward pressure on our selling prices. But since August 2003, when we made a change in our top management, we have accelerated the pace and the intensity of our consolidation cost-cutting and platform growth strategy, and have been able to overcome these adverse forces.

115. Mr. Stockman's statements were materially false and misleading. As described below, sales were inflated by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142). Mr. Stockman's statement about cost-cutting was misleading. As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

116. In addition, these statements were materially false and misleading in the absence of disclosure of several adverse developments. C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175). C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers. CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157). C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

117.  According to an article in the July 27, 2005 edition of the Detroit Free Press (that is, published after the bankruptcy and after the Class Period), on May 24, 2004, DaimlerChrysler induced C&A into signing an agreement to give back to DaimlerChrysler 8.5% of the value of the contract that C&A had with DaimlerChrysler to produce plastic trim for the 300 Magnum Charger vehicle.  C&A was already losing money on that contract, even before the give-back.  DaimlerChrysler also compelled C&A to give back more than 10% of the value of the contract that it had with DaimlerChrysler to produce parts for the Town & Country minivan and the Dodge Ram and Dodge Durango pick-up trucks.  This material adverse information was not disclosed in the August 2, 2004 press release or in the June 30, 2004 Form 10-Q, and did not come to light until after C&A had declared bankruptcy.

118.  On August 26, 2004, the Company issued a press release announcing the completion of its offering of $415 aggregate principal amount of Senior Subordinated Notes:

> Troy, Michigan – Collins & Aikman Corporation [NYSE: CKC], today announced that its wholly owned subsidiary, Collins & Aikman Products Co. ("Products"), completed an offering of $415 million in aggregate principal amount of its senior subordinated notes due 2012 for gross proceeds of approximately $400 million. The notes bear interest at a rate of 12⅞%. The notes are guaranteed by Collins & Aikman Corporation and each of Products' domestic subsidiaries that is a guarantor under its senior credit facility. As previously announced, the gross proceeds from the notes offering will be used to redeem all $400 million in principal amount of Products' 11½% senior subordinated notes due 2006.

119. On November 9, 2004, C&A announced the Company's financial results for the third quarter of 2004, the period ending September 30, 2004.  Specifically, the Company reported third quarter 2004 net sales of $864.8 million, resulting in a loss of 67 cents per share in the third quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt of $25.1 million (or 30 cents per share). The Company further stated that:

The third quarter 2004 pre-tax restructuring of $9.0 million included costs associated with additional actions to right-size the company's overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $20 million when fully implemented. During the third quarter of 2004, the company also recognized $10.3 million of impairments of long-lived assets primarily related to plant closings.

**For the nine months ended September 30, 2004, the company reported sales of $2,968 million** compared to $2,971 million for the comparable period of 2003. The company also reported a net loss of $108.6 million or $1.30 per share, which included $61.7 million (or 74 cents per share) of after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt. For the comparable 2003 period, the net loss was $47.6 million or 57 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $33.1 million (or 40 cents per share).

Collins & Aikman's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1,552 million at September 30, 2004. During the third quarter of 2004, the company completed the refinancing of its senior subordinated debt and senior credit facilities.

**EBITDA was $48.7 million for the third quarter of 2004, which was reduced by charges of $9.0 million for restructuring and $10.3 million for the impairment of long-lived assets.** The third quarter 2003 EBITDA was $41.9 million, which was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets. **EBITDA was $178.2 million for the nine months ended September 30, 2004, which was reduced by charges of $28.9 million for restructuring and $40.7 million for impairment of long-lived assets. EBITDA for the nine months ended September 30, 2003 was $172.8 million, which was reduced by charges of $26.8 million for restructuring and $21.1 for the impairment of long-lived assets.** (Emphasis added.)

120. C&A reported these results, which were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons stated herein, including the improper recording of rebates from vendors, premature billing of invoices and mischaracterization of operating expenses. As described below, sales were inflated

by pre-billing of receivables (¶¶ 146 - 150); vendor rebates were improperly recorded as present revenue (¶¶ 138 - 139); and C&A improperly mischaracterized operating expenses as non-operating or capital expenses (¶¶ 140 - 142). As CI 2 reported (¶¶ 141 - 142) Mr. Stockman personally directed that each plant find operating expenses that could be recharacterized as either capital expenses or non-operating expenses, a practice which is misleading and which violated GAAP.

121. In addition, these financial results were materially false and misleading in the absence of disclosure of several adverse developments. C&A was tied into money-losing contracts which were disclosed only in media reports and only after the end of the Class Period. (¶¶ 168 - 175). C&A was short-staffing projects and creating phony design teams to conceal its deficiencies from its customers. CI 1 and CI 2 both confirmed the practice of playing a "shell game" where people with no involvement in a project were simply rounded up when necessary and sent to meetings with customers to creating the appearance that C&A's design teams were as large as their contracts required. (¶¶ 152 - 157). C&A had such bad quality problems (as a result of short-staffing and cost cutting) that, according to both media reports and confidential informants, C&A failed product reviews over and over again with customers, which critically delayed C&A's ability to recoup its investment in the design and tooling for the interiors of the cars it had contracts on. These quality problems became so bad that GM put C&A on a sort of probationary status during the Class Period, and C&A lost several GM contracts. C&A's Hermosillo, Mexico facility was not state of the art as it had told Ford, endangering its relationship with Ford (¶¶ 156 - 157). C&A had material deficiencies in its internal controls, a fact reported by confidential informants but concealed by C&A during the Class Period.

122. These financial results, reported by C&A, were materially false and misleading with respect to inter alia sales, earnings, operating earnings, EBITDA and revenue for the reasons

stated herein, including the improper recording of rebates from vendors, premature billing of invoices and mischaracterization of operating expenses. The statements concerning costs are materially false and misleading because C&A improperly characterized operating expenses as other kinds of expenses.

123. Defendants Stockman touted the Company's results in the November 9, 2004 press release, stating: "For the fifth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges, was up from the prior year on a comparable basis. This was achieved despite the headwinds from increased commodity costs and OEM production cuts. The savings from the restructuring program that began in the third quarter of 2003 has generated significant fixed cost reductions."

124. These statements by Mr. Stockman were materially false and misleading EBITDA for the reasons stated in the preceding paragraphs, including the improper recording of rebates from vendors and premature billing of invoices. The statements concerning costs are materially false and misleading because C&A improperly characterized operating expenses as other kinds of expenses.

125. On November 9, 2004, the Company filed its Form 10-Q for the quarterly period ended September 30, 2004 with the SEC ("the September 30, 2004 Form 10-Q"). This document, which was signed by defendant Koth, contained financial information which was substantially identical to the financial information that was contained in the November 9, 2004 press release (which were false for the reasons stated in the preceding paragraphs). It did not disclose the Company's accounting policy with regard to rebates. However, it provided the same information contained in ¶ 95, above, concerning rebates received from related parties. These disclosures were materially false and misleading because C&A did not disclose that the rebates received

from related parties were improperly recorded, or that C&A's improper recording of vendor rebates resulted in financial reporting which would later have to be restated.

126. The September 30, 2004 Form 10-Q contained Section 906 certifications by defendants Stockman and Koth.  In addition, the September 30, 2004 Form 10-Q contained a representation which stated: "The accompanying condensed consolidated financial statements...in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations." The September 30, 2004 Form 10-Q, including the certifications which were signed by defendants Stockman and Koth, was materially false and misleading for the reasons specified below.  This was materially false and misleading, as Messrs. Stockman and Stepp were aware of the accounting improprieties and the undisclosed adverse information described in the preceding paragraphs when these statements and certifications were made.

127. On December 13, 2004, the Company issued a press release announcing that C&A Products Co. ("Products"), a wholly owned subsidiary of C&A, and CARCORP, Inc., a wholly owned subsidiary of Products, amended their existing receivables transfer agreement related to its off-balance sheet accounts receivable financing facility. The amended terms included extending the term of the facility to March 10, 2006, and installing as the new Administrative Agent. Additionally, Products and CARCORP entered into a commitment letter agreement with GECC whereby GECC committed to provide a new 5 year, $300 million accounts receivable facility to replace the existing receivables facility, subject to the terms and conditions described therein.   In connection with this receivables facility, GECC would later file papers in the bankruptcy court which demonstrate that C&A had been prematurely billing receivables, as set forth in the next section of this Complaint.

53

128. As summarized above, the Class Period statements referenced above were each materially false and misleading when made in several respects which are explained at length herein at ¶¶ 141 - 185

a.     C&A's financial reporting was false, and violated GAAP, throughout the Class Period because C&A was improperly recognizing revenue based on vendor rebate programs.  The Company has since conceded that it will have to restate prior periods.  In fact, these rebates should not have been treated as revenue at all, but as reductions to the cost of goods sold.  Further, they should have been applied over time, and not in the quarter in which the rebate was received.  Worse, much of the improperly recorded rebates arose in dealings with related parties, particularly businesses owned or controlled by Becker and McCallum.  C&A only belatedly and incompletely disclosed the facts of its related-party transactions, and only after an internal investigation; but even then, C&A failed to fully disclose its policy for accounting for vendor rebates or to disclose that it had recorded these rebates improperly.  The improper handling of rebates renders the revenue, earnings, EBITDA and expenses in each quarter of 2003 and 2004, as well as all certifications of those financial results, materially false and misleading.

b.     C&A's earnings, operating income and EBITDA were materially overstated during the Class Period because the Company was improperly characterizing ordinary expenses as capital expenses and nonrecurring items.  This conduct continued throughout the Class Period and every financial result and certification thereof is materially false and misleading as a result.

c.     C&A's reported revenue and receivables were inflated.  During the Class Period, the Company pre-billed tooling and recorded receivables, and treated these as though they were valid receivables, though the revenue had not been earned and could not properly be recognized under GAAP. This conduct, on information and belief, continued

throughout the Class Period and every financial statement and certification thereof is materially false and misleading as a result.

d.     C&A omitted the material fact that, as described below, before and during the Class Period it became locked into material money-losing contracts with OEMs including DaimlerChrysler.

e.     C&A omitted the material fact that, as described below, it was grossly understaffing projects, and was deliberately deceiving major customers such as Ford to cover up for its inability to pay for the staffing required by its contracts.  Nor did C&A disclose that it was at substantial risk that it could lose contracts if OEMs objected to its staffing practices.

f.     C&A omitted the material fact that, as described below, it had such serious quality problems such that it failed product approval processes over and over, finally losing significant contracts from GM as a result of its poor quality.

g.     C&A omitted the material fact that its Hermosillo, Mexico plant, which it touted to OEMs and private investors as state-of-the-art, was in fact both understaffed and stocked with used equipment shipped from other locations.  Nor did C&A disclose that it was at substantial risk of losing contracts if OEMs objected to the way C&A ran the Hermosillo facility.

h.     C&A's management was warned that its internal controls were materially deficient, but it omitted this material fact and even made assertions that the Company's financial reporting contained everything necessary to fairly and accurately present the Company's financial performance.

## THE FIRST ADMISSION OF FINANCIAL TROUBLE

129. On March 17, 2005, C&A issued a press release entitled "C&A Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters," in

which the Company disclosed that it would be delaying its financial results for Fiscal Year 2004.

The Company stated it had initiated an internal review of how it was accounting for supplier

rebates, which revealed that the Company was prematurely or inappropriately recognizing

revenue.  The Company stated that it expects to restate its results for the nine months ended

September 30, 2004 to reflect the correct accounting for these rebates and that it was continuing

to evaluate whether a restatement of its fiscal year 2003 results would be necessary.  The

Company stated that it expected to reduce its previously reported operating income by $10 - $12

million for the nine months ended September 30, 2004.  The press release stated:

> **The Company did not file its Annual Report on Form 10-K containing fiscal 2004 audited financial statements by its due date yesterday** since it requires additional time to complete the review of the accounting issues referred to below, the financial reporting process, and the Company's assessment of controls over financial reporting.  (Emphasis added.)

*****

> During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, **the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices.**  The Company immediately initiated an internal review of these matters and expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates.  The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary.  **The Company presently expects to reduce its previously reported operating income by $10 - $12 million for the nine months ended September 30, 2004.**  The Company's outside auditors have not reviewed these conclusions, and additional adjustments may be required.  (Emphasis added.)

*****

**Internal Accounting Investigation and Related Matters**

In the ordinary course, the Company has received and continues to receive rebates as a result of arm's length transactions with its vendors.  Depending upon the terms of the rebate agreement, these

56

rebates are either recognizable in the quarter in which the rebate agreement is reached or recognized over an appropriate future period. In the course of finalizing the Company's 2004 financial results, the Company identified certain issues related to accounting for supplier rebates that led to premature or inappropriate income recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated a review of all vendor rebates it received from 2002 through 2004 to ensure that it has properly recognized the rebates in the appropriate quarterly period. The Company has completed its accounting review of these rebates, but expects to undertake a thorough review of its controls, procedures and other circumstances that led to the premature or inappropriate income recognition and that was inconsistent with relevant accounting standards and the Company's policies and practices. The nature and scope of that review is under consideration. The Company's Audit Committee and outside auditors have been informed of these issues and are evaluating an appropriate course of action.

**The Company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004. Of such amount, the Company believes that net adjustments of approximately $10 - $12 million are required primarily occurring during fiscal 2004. The Company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions.** The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. We have not taken into account this impact in our preliminary report of 2004 results. These preliminary results remain subject to material change and have not been reviewed by our outside auditors. (Emphasis added.)

The press release further discussed the material weaknesses in C&A's financial controls:

**The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, in addition to the matters leading to the restatement described above, existed at December 31, 2004,** but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent of those material weaknesses remains under review. (Emphasis added.)

*****

The potential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate

accounting expertise to address accounting and reporting matters in certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation-related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit is ongoing.

*****

The same press release disclosed that the accounting problems impacted C&A's financing.

**Impact on Financing Arrangements**

The Company intends to operate in the ordinary course, but it cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the internal accounting investigation, the audit and the restatements. Until the audit and any restatements are complete, it will be difficult to determine the full scope of any financial restatement or prior period adjustments arising from these irregularities. Consequently, the Company is still evaluating its financial covenant compliance under its senior credit facility, as well as other compliance issues under other financing arrangements. If necessary or desirable, the Company will seek a waiver of relevant provisions.

The Company is obligated to provide audited financial statements under a number of its debt, receivables facility, operating lease and other agreements within prescribed periods. The Company relies upon its receivables facility with GE Capital Corporation for its liquidity and the unavailability of funds thereunder would be material and adverse. The Company has received waivers of various provisions of its receivables financing facility and its Hermosillo, Mexico funding arrangements, both of which are held by GE Capital Corporation, so that it will continue to provide the Company with access to financing under those facilities in the

ordinary course of business until May 20, 2005, absent certain new adverse developments. The Company also intends to seek waivers and amendments of its bank credit facilities and of various lease agreements, as required or desirable. There can be no assurance that any other required or desirable waivers will be received on a timely basis and the failure to obtain waivers could be material and adverse.

130. Upon this disclosure, shares of the Company's stock fell $0.39 per share, or about 24% to close at $1.24 per share, on unusually heavy trading volume.

131. Significantly, although the Audit Committee had focused its previous investigation upon non-disclosed rebates during 2003 and the first quarter of 2004 and caused the Company's financial statements to disclose certain information concerning "rebate arrangements" (March 11, 2004 press release), the March 17, 2005 press release disclosed that more than 10% of the Company's rebates had been improperly recognized as income, and that a portion of the improperly recognized rebate might necessitate "a restatement of its 2003 results."

132. The press release further disclosed "reduced volumes in the fourth quarter on several key North American programs" and a $500 million write-off of goodwill and deferred tax assets due the expectation of future losses - contract-related losses that were known to defendants during the Class Period but were not previously considered in connection with assessment of impairment losses or realization of deferred tax assets, thereby materially overstating goodwill and deferred tax assets throughout the Class Period.

133. Upon the issuance of the March 17, 2005 press release, the price of the Company's stock dropped to a closing price of $1.24 as compared to a closing price of $1.63 on the previous day in recognition of the fact that defendants had concealed the existence of approximately $30 million of rebate income each year, a material portion of which had been improperly recorded as income.

134.  On March 24, 2005, C&A issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters."  Therein the Company stated:

> Collins & Aikman Corporation (NYSE: CKC) announced today that its Audit Committee has retained independent counsel to assist it in its investigation of the Company's accounting for certain supplier rebates.
>
> *****
>
> The Audit Committee has determined to conduct an independent investigation into these matters.  It has retained independent counsel, Davis Polk & Wardwell, for that purpose, and they expect to retain such other advisors, including an accounting expert, as they deem appropriate.
>
> As previously announced, **the company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004.**  Of such amount, the company's management believes that net adjustments of approximately $10-$12 million are required primarily occurring during fiscal 2004.  For further clarification, the company announced that management's preliminary analysis indicates that, of such amounts, approximately $8-$10 million would impact the previously reported nine months ended September 30, 2004 with the balance impacting 2003.  The company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions and is continuing to evaluate whether a restatement of its 2003 results will be necessary. (Emphasis added.)
>
> *****
>
> The company further announced that it initiated a process for obtaining waivers of the financial statement delivery requirements for a period of time from its lenders under its senior credit facility and for modifications of certain of its financial covenants.  There can be no assurance that any of the required or desirable waivers from our senior lenders, lessors or others will be received on a timely basis, and the failure to obtain waivers could materially and adversely affect the company and its liquidity.

135. On May 12, 2005 the C&A Board unanimously sought Stockman's resignation over concerns that he was misleading the Board. According to press reports:

> It was unanimous and it was fast. Go. Now, there seemed to be a
> pattern of not sharing all of the information with his financial staff
> and with the board. The first quarter was worse than he said it
> would be and the board got hot.

Stockman was replaced by Becker, another Heartland insider.

136. The May 12, 2005 announcement confirmed that the March 17, 2005 press release

was materially false and misleading and, for the first time, exposed just how severe the problems

facing C&A were:

> The company further commented on the status of the ongoing
> investigation by the Board's audit committee into the company's
> accounting for certain supplier rebates. The company previously
> reported that it had identified certain accounting for supplier
> rebates that led to premature or inappropriate revenue recognition
> or that was inconsistent with relevant accounting standards and the
> company's policies and practices. While the investigation is
> ongoing, the audit committee has preliminarily indicated that it
> believes that the company's previously announced adjustments to
> reported periods to correct the accounting for these rebates will
> likely be understated, but it has not yet quantified the extent of this
> and has not submitted its findings to management for review at this
> time. In addition to vendor rebates, the audit committee's
> investigation also is reviewing the company's forecasts for the first
> quarter of 2005 and related matters, as well as other matters that
> have arisen in the course of its investigation. The company cannot
> currently comment upon the timing for completion of, or the
> ultimate scope or outcome of, the audit committee investigation,
> the audit or any necessary restatements. As previously discussed,
> the company has not yet filed its annual report on Form l0-K for
> 2004 due to this accounting matter and the need for additional time
> for completion of the 2004 audit and the review of internal controls
> over financial reporting under Section 404 under Sarbanes-Oxley,
> and it does not expect to make its first quarter 2005 filing on a
> timely basis.

137. This press release admitted that previously announced rebate income adjustments

were low ("While the investigation is ongoing, the audit committee has preliminarily indicated

that it believes that **the company's previously announced estimated adjustments to reported**

**periods to correct the accounting for these rebates will likely be understated**, but it has not

yet quantified the extent of this and has not submitted its findings to management for review at

this time."). (Emphasis added.) In addition, the Company revealed (in the May 12, 2005 press release) that:

  a.   the Company had breached a debt covenant ("consolidated leverage ratio, or consolidated debt to EBITDA, as defined in the covenant"); and

  b.   the company had "a significant foreign factoring arrangement, under which outstanding factored balances were approximately $96 million at March 31, 2005" and a "material European factoring arrangement that relates principally to one customer is due to expire at the end of this month."

138. Five days later, on May 17, 2005, C&A announced that it had sought Chapter 11 bankruptcy protection the previous day in the United States Bankruptcy Court for the Eastern District of Michigan, and warned of significant near-term liquidity problems. On May 25, 2005, the New York Times reported in an article entitled "A Reagan Budget Czar Grapples With Investment Woes," that Stockman had turned over control of Heartland to two of his partners.

139. The market's reaction to this news was dramatic. The value of C&A common stock dropped precipitously. After falling approximately 25% on March 17, the final acknowledgements of the Company's sorry state saw the stock drop from $.78 to $.11 in the days following the May 12 disclosures and May 17 bankruptcy filing. The price of C&A's 12.875% Notes also nose-dived from an offering price of $96.416 down to $3.00, and the price of the 10.75% Notes, which was trading above $90 before the truth about C&A was revealed, dropped to $23.00.

140. C&A and the defendants are now facing a criminal investigation. Following the declaration of bankruptcy, C&A received a grand jury subpoena from the SEC related to its accounting for the years 2000-2005.

## UNDISCLOSED ADVERSE INFORMATION

**Financial Statements**

141. Defendants' statements regarding C&A's operating income and EBITDA were materially false and misleading for at least the following reasons:

142. First, C&A has conceded that it must restate its 2003 and 2004 financial results because it accounted improperly for rebates received from vendors, some of whom are related parties. The materially false financial reporting during the Class Period impacted revenues, cost of sales, operating income, earnings and EBITDA.

143. Second, defendants were improperly classifying tens of millions of dollars of actual operating costs as "restructuring" or "impairment" charges. When reporting EBITDA, defendants repeatedly emphasized EBITDA before any extraordinary or unusual charges (such as restructuring or impairment charges) were incurred. defendants did so because they understood that investors would largely ignore these restructuring and impairment charges when making their investment decisions, because investors considered them to be "non-operating" or "nonrecurring" charges which did not impact the Company's core operations or future cash flow.

144. Defendants manipulated EBITDA before restructuring and impairment charges by improperly classifying ordinary operating costs as "restructuring" and "impairment" charges. These manipulations were confirmed by CI 2, who said that he and his staff were always under pressure to categorize ordinary expenses as capital expenditures or non-operating expenses to avoid an immediate impact to EBITDA. In fact, CI 2 said that C&A frequently tried to interpret routine operating expenses as "restructuring expenses," and that Stockman was always creative in the way he transformed expenses into capital outlays.

145. CI 2 also said it was the Company's "standard mode of business" to evaluate every expenditure in an attempt to classify it as either capital or non-operating, and that during every

quarter from at least mid-2003 through the end of 2004, Stockman encouraged C&A facilities to classify operating expenses as non-operating, in a Company-wide effort to increase EBITDA. CI 2 even noted that when the President of his division, Reed White, retired in the third quarter of 2004, C&A recorded White's salary through the end of 2004, which is a classic example of a normal operating expense, disguised as a restructuring expense.

146. Third, on information and belief, the Company's reported revenues, operating income and EBITDA were materially misrepresented because C&A artificially inflated its reported sales. On information and belief, C&A "pre-billed" millions of dollars of receivables, and fabricated the documentation needed to support those receivables. On or about June 22, 2005, GECC filed a motion in the United States Bankruptcy Court for the Eastern District of Michigan seeking relief from the automatic stay imposed by the Bankruptcy Code. According to that motion, at the time of C&A's bankruptcy filing C&A owed GECC at least $78 million and GECC held a security interest in C&A's accounts receivables. The parties' agreements required C&A to deposit any collections in a lockbox for the benefit of GECC. However, C&A was instead converting such collections for its own use, rather than providing them to GECC. As a result, GECC was asking the Court to allow it to seize records maintained by C&A regarding its receivables and collections, and to receive the collections directly.

147. According to exhibits filed in support of that motion, C&A was pre-billing receivables, and was repeatedly unable to provide information GECC had requested to verify that the Company's receivables were valid. Specifically, on June 3, 2005, GECC sent a letter to C&A stating that "this morning, we were advised by KZC Services, LLC, the financial consultants to C&A Products, that a potentially material portion of the Receivables owned by [C&A] may constitute pre-billed tooling Receivables which had been incorrectly identified as Eligible Receivables in various reports" provided to GECC. The letter noted that GECC was "gravely

concerned" about this revelation and "expected to receive a comprehensive accounting of the nature and amount" of the Company's receivables. The letter further stated that C&A and its financial consultant "will be working over this weekend [i.e., June 4-5, 2005] to obtain detailed information concerning these Receivables," and would report their findings to GECC on Monday, June 6.

148. Significantly, C&A was unable to provide the information requested by GECC. On June 13, 2005, GECC sent another letter to C&A, reiterating its concerns and stating that while "we have received copies of invoices and purchase orders for the 50 largest tooling Receivables as of April 30, 2005, we have yet to receive a full accounting of current balances nor, despite our repeated requests, have we received copies of source documentation such as customer acceptances, written consents to billing, or evidence that tooling is in volume production." As a result, GECC demanded to exercise its right under its agreement with C&A to conduct an "onsite audit" on June 14 to verify C&A's receivables, which would include "reconciliation of account receivable balances, recent customer remittances and recent payments from the [customers], as well as review of the purchase orders, invoices and other documentation relating to the Receivables." Ultimately, it is not clear that GECC ever obtained this information. According to GECC's motion, which was filed on June 22, 2005, as of that date "GECC had been provided virtually no information by C&A."

149. The information relating to C&A's accounts receivables that GECC requested are the fundamental records supporting outstanding accounts receivable which companies typically and routinely maintain, and such information should have been readily available from the records of C&A, specifically, within C&A's accounts receivables department. Indeed, C&A's contract with GECC specifically required C&A to "keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables

(including, without limitation, records adequate to permit the daily identification of each new

Receivable and all Collections of and adjustments to each existing Receivable)", and as set forth

above also allowed GECC to review such documents upon request. Had this information existed,

and C&A's accounts receivables been in order, C&A would have had no reason not to provide it

to GECC, and in fact would have readily provided it to GECC.

150.  Failure to maintain these records was a violation of C&A's GAAP obligations.  As

stated in SEC Staff Accounting Bulletin No. 99 ("Materiality"):

> Even if misstatements are immaterial, registrants must comply with
> Sections 13(b) (2) – (7) of the Securities Exchange Act of 1934 (the
> "Exchange Act").   Under these provisions, each registrant with
> securities registered pursuant to Section 12 of the Exchange Act, or
> required to file reports pursuant to Section 15(d), must make and
> keep books, records, and accounts, which, in reasonable detail,
> accurately and fairly reflect the transactions and dispositions of
> assets of the registrant and must maintain internal accounting
> controls that are sufficient to provide reasonable assurances that,
> among other things, transactions are recorded as necessary to
> permit the preparation of financial statements in conformity with
> GAAP.   In this context, determinations of what constitutes
> "reasonable assurance" and "reasonable detail" are based not on a
> "materiality" analysis but on the level of detail and degree of
> assurance that would satisfy prudent officials in the conduct of their
> own affairs.  Accordingly, failure to record accurately immaterial
> items, in some instances, may result in violations of the securities
> law.

**Adverse Business Developments**

151.  In addition to misstating the Company's financial results, defendants also made a

series of material false statements regarding C&A's business. In the months leading up to C&A's

private placement in August 2004, defendants consistently touted C&A's supposedly "world-

class" business facilities and operations, including its purported "new business wins," "unique

and unusually attractive competitive position" and "superior business model." These statements

were designed to convince investors that C&A was a leader in its industry that was overcoming

difficult market conditions, and was a healthy company with bright future prospects.

152. For example, in the August 2, 2004 Press Release, defendants highlighted the supposedly superior quality of C&A's business, and touted the Company's "high-quality products," which it described as "the most effective in the industry." The press release also touted C&A's "New Business Wins," stating that "during the second quarter of 2004, Collins & Aikman continued to achieve good progress on increasing new business by adding $450 million of annual newly booked business." Defendants expanded on these statements on the August 2, 2004 conference call, where defendant Stockman stated, among other things, that "we are continuing to be awarded new business at a very healthy pace that will sustain our growth trajectory that we have talked to you about previously."

153. Defendant Stockman also emphasized the importance to C&A of being positioned "green" by the Company's major customers (i.e., in the view of its customers, C&A was able to honor its contracts by consistently delivering conforming parts on a timely basis), stating "Now in order to take advantage of these opportunities -- the long-term awards in a regular way and transfer or capture of business in the short run - we need to be positioned green, to quote, in the eyes of our major customers."

154. Defendants' statements regarding C&A's business and operations were materially false and misleading for several reasons.

155. First, C&A was not properly staffing and tooling its projects. These problems were causing C&A's customers to cancel contracts and withhold payments, which, in turn, had a devastating effect on the Company's available cash and credit.

156. According to CI 1 and CI 2, OEMs required C&A to assign specific numbers of appropriate personnel to construction projects. However, because of C&A's deteriorating financial condition, during the summer of 2004 the Company did not have anywhere near the

number of staff required to service its existing projects, let alone the number needed to service any new business

157. According to CI 2: when a particular OEM demanded to meet with a project team it was not unusual for C&A to "play a shell game" by pulling design and engineering staff from other projects in order to show the OEM the required number of personnel. These personnel were not actually assigned to these projects, however, and usually within a week, the counterfeit staff was back manning their original projects until the next time the OEM required a meeting. For instance, CI 2 recounted occasions when Ford, which had required twenty-two designers and engineers to staff a project for the Mustang, called meetings of the C&A staff. At the direction of his superiors, CI 2 first combed through C&A organization charts to try to dig up the required number of personnel. When he failed to find enough people, Stockman appeared at two meetings with Ford to explain why C&A could not have all of the personnel in attendance.

158. The problems experienced by C&A in staffing projects were confirmed by a former C&A executive, who was quoted in press reports in May 2005. The former C&A executive, who left C&A in 2004, stated that C&A often cut back engineering, design and manpower for automaker programs, even though the Company had promised certain levels of engineering, or a certain number of people on a program.

159. Another striking example of C&A's inability to properly staff its projects was the Hermosillo facility. According to the former C&A executive, the Hermosillo project was severely understaffed. This executive stated that while C&A had committed to Ford that it would have a certain number of people for this project, it only had half that number of employees involved. This situation put the entire project at risk. According to a May 18, 2005 article in the Detroit Free Press:

> We committed to a certain number of people for Ford on the
> Fusion, but we had half as many as we said we did. Ford wanted

> regular meetings with us on the Fusion, so we'd send people to
> Dearborn who were managers that knew nothing about design or
> about the Fusion and tell Ford they were a designer to make it look
> like we had X number of bodies for Ford. They were just
> placeholders. Had Ford asked them a question about the Fusion it
> would have been ugly. It was outright deceit.

160. Moreover, C&A was not properly supplying the Hermosillo facility with high-quality, modern equipment. Even though C&A represented that the facility would be a "world class" facility with all new equipment, C&A was actually stocking it with secondhand machinery. According to the May 17, 2005 article in the Detroit Free Press, after Ford learned of this it became "frustrated that C&A [had] sent secondhand machinery to the plant" and was "worried that, among other things, C&A's angry vendors could disrupt production and not deliver parts on time."

161. Second, C&A was increasingly producing non-conforming parts that did not meet its customers' specifications and manufacturing parts that OEM's would not pay for caused the Company to burn through its available cash and revolving credit.

162. According to CI 2, the Company had a regularly recurring problem with the Production Part Approval Process, or "PPAP." Under PPAP, when C&A was ready to finally produce a part, the Company provided its customer with a prototype part for the customer's inspection. This normally occurred thirty days before the OEM's scheduled start of production. However, by the summer of 2004, the Company's production had become so poor that, according to CI 2, it increasingly had "bad launches" of components, and was frequently unable to pass PPAP on a timely basis. As set forth below, this created significant liquidity issues for C&A, and seriously undermined C&A's relationships with OEMs, because those OEMs could not start production until C&A's parts passed PPAP.

163. For example, CI 2 described how C&A's production issues created significant problems with General Motors, which accounted for approximately 22% of the Company's

revenue in 2003. During the early summer of 2004, C&A had six companywide "bad launches" of GM components. The problems were so severe and pervasive that GM warned C&A that one more "bad launch" would automatically result in GM putting the Company on "new business hold," also known as "going red." This meant that, in GM's view, C&A was unable to consistently deliver conforming parts and did not have a plan to remedy the problem.

164.  The seventh bad launch occurred in October 2004, while C&A was in position to be awarded contracts for GM's Hummer HX Mini Van and Theta Platform. As a result, C&A lost both contracts.

165. C&A's increasingly substandard production was also draining the Company's available cash and credit, which was critical to C&A's viability as a going concern.

166. For a company such as C&A, manufacturing substandard products which do not conform to customer specifications or requirements often results in liquidity issues. That is because automotive parts companies like C&A have to pay their vendors in order to keep supplies coming in, but do not get paid themselves until the parts they deliver are approved under PPAP by their OEM customers. Indeed, C&A customarily advanced all costs incurred in connection with tool and design projects, and was only paid when the parts passed PPAP.  This meant that C&A was forced to front what was often millions of dollars in costs until PPAP occurred. PPAP was supposed to occur thirty days before an OEM's start of production. However, according to CI 2, because of C&A's increasing incidents of production failure, C&A often did not pass PPAP until ninety days or more after the OEM's scheduled start of production. Thus, instead of being paid thirty days before the start of production, the Company was not being paid in many instances until ninety days or more after the start of production. This had a significantly negative effect on the Company's cash flow and liquidity.

167. During the early summer of 2004, the cash and credit drain caused by the PPAP situation became so bad that, according to CI 2, C&A became what is known in the automotive parts industry as a "distressed supplier." C&A's manufacturing difficulties were so pervasive that it essentially had to beg OEMs to pay at least some portion of the contract price for those components that were close to conforming.

168. By the end of the Class Period, these problems had already caused a substantial adverse effect on C&A's relationship with its own suppliers. According to CI 1, C&A routinely held its accounts payable until the Company started to receive collection notices from suppliers in a desperate measure to conserve cash. And CI 2 stated that C&A's practice of delaying payments to suppliers became so prevalent that, beginning no later than the second quarter of 2004, C&A's Treasurer established an unwritten "rule" that no supplier would be paid unless that supplier first sent C&A a written threat to shut down delivery.

**Defendants Misrepresented C&A's Carrying Values for Goodwill and Deferred Tax Assets.**

169. Defendants also misrepresented C&A's goodwill and deferred tax assets.

170. As discussed in more detail below, on March 17, 2005, defendants announced that C&A would write off $500 million of goodwill for the Company's U.S./Mexico Plastics and Global Fabrics reporting units, and $177 million of deferred tax assets related to the U.S. and Italy. Under relevant generally accepted accounting principles, Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), Statement of Financial Accounting Standards No. 109 "Accounting for Income Taxes", those write-offs mean that (a) the present value of the discounted cash flow from those two reporting units was insufficient to support the carrying value of goodwill, and (b) the anticipated taxable income was insufficient to support carrying the deferred tax assets.

**C&A Was Locked Into Money-Losing Contracts**

171. During the Class Period, defendants knew or should have known that C&A's operating results and industry conditions existing at the time required defendants to undertake an impairment analysis and an assessment as to whether or not deferred tax assets would be realized. Such an analysis would have revealed that the carrying values of the goodwill and deferred tax assets were materially overstated and would have required C&A to record a substantial impairment charge.

172. According to an article in the July 27, 2005 edition of the Detroit Free Press, on May 24, 2004, DaimlerChrysler coerced C&A into signing an agreement to give back to DaimlerChrysler 8.5% of the value of the contract that C&A had with DaimlerChrysler to produce plastic trim for the 300 Magnum Charger vehicle. C&A was already losing money on that contract, even before the give-back. DaimlerChrysler also compelled C&A to give back more than 10% of the value of the contract that it had with DaimlerChrysler to produce parts for the Town & Country minivan and the Dodge Ram and Dodge Durango pick-up trucks. This material adverse information was not disclosed in the August 2, 2004 press release or in the June 30, 2004 Form 10-Q.

173. According to the article "C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform." In addition, according to this article, C&A had been locked into numerous other loss contracts at least as early as the date of issuance of the June 18, 2002 Registration Statement and as of May 2004 was "fighting a losing effort to stave off bankruptcy." The article (byline by Jeffrey McCracken) stated:

> Production of Detroit's hottest car in years, the Chrysler 300 sedan, came perilously close to a complete shutdown this spring as a crucial and desperate supplier threatened to pull the plug unless Chrysler paid more for parts.

Such a warning is the auto industry equivalent of a nuclear weapon -- rarely threatened and almost never used.

But in the days and weeks before struggling auto parts maker Collins & Aikman Corp. ousted its chief executive, David Stockman, on May 12, the former Michigan congressman warned his largest customer, the Chrysler Group, he was going to stop sending instrument panels to the Brampton, Ontario, assembly plant. That plant makes one of the most popular cars in the country -- the Chrysler 300.

A shutdown would have been devastating to Chrysler, because the much-hyped Chrysler 300 and other cars from that plant have been the backbone of Chrysler's recent market-share gains and are those rare vehicles that sell largely without incentives. However, Troy-based Collins & Aikman was running out of cash and was burdened by a series of unprofitable contracts, the biggest of which was probably this one, said two senior auto officials.

"A shutdown was within days," said one top auto official, who asked not to be named because of lawsuits surrounding C&A.

Three automotive officials familiar with the tense negotiations spoke to the Free Press for this report but asked not to be named for various reasons.

**Stockman, fighting a losing effort to stave off bankruptcy, made the threat because C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform.** C&A filed for bankruptcy protection May 17 and is now being propped up by hundreds of millions of dollars from the automakers.

**Two senior auto officials estimated C&A was providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on each one. Chrysler is on pace to build about 260,000 of the Chrysler 300, Dodge Magnum and Dodge Charger models this year.**

Stockman was pressing for small price increases from Chrysler, with the hope he could leverage a deal to get similar concessions from General Motors Corp. and Ford Motor Co., C&A's second- and third-largest customers, **and keep C&A out of bankruptcy**. Detroit's automakers are reluctant to give price increases to their suppliers for a part that is in production and are even more resistant to let it become public.

The showdown between C&A and Chrysler is a glimpse into the increasingly adversarial relations between Detroit's automakers, who are fighting a product onslaught from Asian automakers, and the parts suppliers, who've been squeezed between rising steel and plastics prices and automaker demands for lower prices.

Now that C&A is in bankruptcy, it is costing the automakers dearly -- maybe even more than the original concessions would have. When Chrysler reports its second-quarter earnings on Thursday, the Free Press has learned the automaker will tell Wall Street it had to take a special provision for extra costs associated with propping up C&A. There could also be a cost associated with the third quarter, said two auto officials.

Automakers have ponied up about $335 million to keep C&A going, money that will last only through the end of September, a deal that includes 15% price increases on their C&A contracts.

**Automakers and suppliers have butted heads for years over everything from prices to who pays the bill in a product recall, but rarely do relations get so bad that a shutdown is threatened. Longtime auto observers said they could not recall a time when a supplier intentionally shut down an automaker, but with bankruptcy staring C&A in the face, they said perhaps Stockman felt he had no other choice.**

"Suppliers have that power to shut down automakers, they've got that nuclear button at their fingertips, but they never push it because they are afraid how automakers will react," said Jim Gillette of CSM Worldwide who has worked in the industry since 1988.

"There is lip service out there that automakers and suppliers are getting along now, but that doesn't fly. I think it is more tense than ever with the global pressure and low-price parts from China forcing everyone, even Toyota, to be more cost-conscious. If you want to blame it on someone, I guess blame it on the consumer who wants more and more for a lower price," he said.

Chrysler spokesman Mike Aberlich declined to comment.

C&A's restructuring officer John Boken, who came in after Stockman departed, said he did not know the details of Stockman's negotiations with Chrysler, except that the ousted CEO was trying to get price increases from various automakers.

Didn't understand pricing

74

**The tension between Chrysler and C&A goes back to when Stockman took over in August of 2003 as chief executive for C&A, a $4-billion supplier that he had helped put together through a series of acquisitions. He had been chairman of C&A and helped run a private equity fund called Heartland Partners that was buying up other suppliers to merge them into C&A.**

**His biggest buy was the plastic-trim business from Textron Automotive for $1.2 billion in August of 2001. The contract to make parts for Chrysler on the 300, Magnum and Charger was included in the purchase.**

**A senior auto official familiar with C&A said Heartland's people "weren't experienced enough to understand pricing on instrument panels. They didn't see that Textron had lowered the price a lot to make sure they got the business, so it was underwater from the beginning."**

**After Stockman took over, he immediately began to butt heads with Chrysler over pricing. Chrysler took some contracts from C&A and gave them to rivals; meanwhile Stockman walked away from a contract to make parts on the Dodge Stratus and Chrysler Sebring.**

**The two sides fought over pricing well into 2004, with Chrysler shopping around much of the $1.2 billion it did in annual business with C&A. In the spring of 2004, Chrysler threatened to yank the 300-Magnum-Charger contract from C&A and give it to Intier, a rival plastics supplier.**

C&A, which had already spent about $50 million gearing up for the contract, agreed to give price concessions to Chrysler to keep the business, figuring it was better to lose some money on the contracts than to not have the contract at all. That was a no-win situation C&A apparently found itself in often through 2004 and 2005, said senior auto officials.

**A May 24, 2004, agreement between Chrysler and C&A, a copy of which was read to the Free Press, shows C&A agreed to give back 8.5% to Chrysler on the 300 contract -- even though it was already unprofitable.**

"There was no choice. The contract was going to get moved otherwise," said an auto official who asked not to be named because the person is still in the industry.

**C&A also gave double-digit percentage breaks on parts it made for the Chrysler Town & Country minivan, Dodge Ram and Dodge Durango, according to the agreement. In bankruptcy court, it has been estimated C&A has at least 35 unprofitable contracts, some of which were unprofitable from the beginning, others of which became unprofitable as plastic prices rose or because C&A gave more concessions to keep the contracts.**

The Chrysler 300 contract was underwater for all of those reasons.

As the cost for plastics went up with rising oil prices through late 2004 and early 2005, C&A went back to Chrysler around March of this year and demanded some price relief on the contract. C&A's target was to get 5-10% increases, or about $35-$65 relief per car.

The two companies haggled through from March until Stockman's departure in mid-May. While C&A officials pushed, Chrysler resisted.

Officials familiar with C&A's perspective said a deal for a price increase was close and would have been followed by deals from GM and Ford. An official familiar with Chrysler said no deal was imminent, so a shutdown was probably more likely.

Either way, something unusual in the auto industry was about to happen -- but didn't.

Instead the outcome is something that is becoming more common: A supplier goes into bankruptcy and gets the same or better price concessions it sought before.  (Emphasis added.)

174.  Defendants not only concealed the existence of loss contracts from the investment community during the Class Period, they made affirmative statements which caused the investment community to believe that "low margin" business was being dropped.  For example, during the February 20, 2003 conference call, defendant Stepp stated: "Sales during the fourth quarter of 2002 were positively impacted by cockpit module growth and new product launches partially offset by production adjustments by DaimlerChrysler, the elimination of the extended enterprise business with JCI **and other low margin businesses primarily in Europe**..." (Emphasis added.)

76

175. Additionally, during the February 20, 2003 conference call, Millard King, Executive Vice President Of Global Manufacturing Operations For Carpet And Acoustic Systems stated:

> In December 2002, we've closed a herd setter (ph) Sweden plant where we discontinued low margin businesses and moved the higher margin businesses such as the Volvo, truck rear shaft absorbers and luggage trim to other C&A plants...While we see our 2003 European carpet and acoustic sales decreasing by about 25 to 30 percent, including **loss of low margin business, as a result of our improvement actions** we will be significantly increasing the 2003 EBITDA performance as a percent of sales over the 2002 levels. (Emphasis added.)

176. Similarly, during the Company's November 13, 2003 conference call, defendant Stockman stated that defendants had performed a review of C&A's backlog and concluded that certain programs were not worth keeping:

> ...we have evaluated certain future business awards already in our backlog and concluded that certain programs are not consistent with these higher hurdle rates. A case in point are the Daimler Chrysler desizing of midsize vehicle on which C&A was awarded the interior trim package last April, but which would not produce revenue until mid 2006 at the earliest.
>
> This program in particular would have required front end investment for E and D, Capex and so forth of over $50 million over 2003 to 2005. And what we believe to be in addition excessive givebacks on current business in return for this award. Because of the inherent volume risks in this congested segment, the returns look less promising than many alternatives the company is currently pursuing. Therefore C&A has fully accommodated Chrysler's effort to transition the desegment to another supplier.
>
> **In this context let me be very clear. We are and remain in the business of gaining more business, but not at any price**. Let us also make clear that this episode involves a discrete and specific investment decision on a specific platform. We obviously value or relationship with Daimler Chrysler and remain dedicated to world-class performance and all existing and future work they may award us. In fact Collins & Aikman is currently launching multiple programs for Daimler Chrysler that are critical for both companies and we remain fully committed to supporting [inaudible] launches in all of these programs. (Emphasis added.)

177.  Other affirmative statements by defendants before and during the Class Period were also materially false and misleading.  For example, prior to the Class Period during a November 14, 2002 conference call, defendant Stepp stated: "We talked about some of the Chrysler shut-downs, for example. Virtually all of those were very high content vehicles. **You're talking probably 6 to 700 per vehicle on those vehicles. And those are good profitable programs. Probably at least 30, 35 percent margins**."  (Emphasis added.) This statement was materially false and misleading as confirmed in the news article specified above ("Two senior auto officials estimated C&A was providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on each one"), and it was never corrected.

178.  During a March 11, 2004 conference call, defendant Stockman stated: "**Number one, the first quarter is highlighted by the launch of the new Dodge Magnum and Chrysler 300C**, Chrysler's new large car rear-wheel drive platform. Collins and Aikman has significant content on these vehicles, including the instrument panel and cockpit assembly sequencing, the center console, acoustics package, flooring, doors, including the sequencing of doors into the assembly plant at Brampton, accessory maps, key fabrics and other trend items. **These vehicles are key to both our and Chrysler's success**."  (Emphasis added.) This statement was materially false and misleading as confirmed above ("A May 24, 2004, agreement between Chrysler and C&A, a copy of which was read to the Free Press, shows C&A agreed to give back 8.5% to Chrysler on the 300 contract -- **even though it was already unprofitable**.").  (Emphasis added.)

**Material Weaknesses in Internal Controls**

179.  Defendants also made public statements about the quality of C&A's internal controls over its financial reporting. defendants knew that an important consideration for investors is whether the company has sufficient internal controls in order to provide accurate financial information to investors. Internal controls are critical safeguards for investors because they

provide comfort that the Company keeps accurate financial information and can meaningfully evaluate operating performance. Internal controls are particularly important in a large and diverse company such as C&A, which had operations and employees all over the world.

180.  This was particularly true because, immediately prior to the Class Period, C&A had reported serious problems with its internal controls as evidence by the following statement which appeared in the 2002 Form 10-K:

> As a result of its 1999 audit, Arthur Andersen LLP reported material weaknesses in the Company's internal control systems. The identified conditions specifically related to four of our foreign locations, most of which were acquired in 2001.  These weaknesses were primarily attributable to the effects of implementing a new computer system as part of our acquisition integration strategy and Year 2000 compliance efforts.  Issues at these locations primarily related to the detail records supporting the general ledger and staff training needs.  As a result, in 2000, the Company committed significant resources to addressing the issues, including the re-implementation of certain systems, implementing an internal audit function and replacing controllers at three of the four locations. The Company made significant progress in addressing these issues; however, Arthur Andersen LLP continued to report material weaknesses following its 2000 audit because two of these four foreign locations were assessed as continuing to have similar material weaknesses as in 1999.  Improvement efforts at these locations were hampered by personnel turnover and continuing acquisition integration efforts.
>
> Arthur Andersen LLP did not modify its report on the Company's 1999 and 2000 audited financial statements as a consequence of these material weaknesses.  The Company is continuing its efforts to address these matters and believes that it corrected all these matters during 2001.

181.  On June 26, 2003, C&A filed a Form 8-K which stated:

> In connection with its 2001 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations.  Corrective actions were implemented in 2002. **In**

> **connection with its 2002 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account reconciliations, review of non-standard journal entries, revenue accounting and currency translation at foreign locations and compliance with established Company accounting policies and procedures.** These conditions were attributable primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC-Trim acquisition.  (Emphasis added.)

182.  Significantly, the existence of these "reportable conditions" were not disclosed in the 2002 Form 10-K or the March 31, 2003 Form 10-Q.  Instead, the 2002 Form 10-K (which was incorporated by reference into the March 31, 2003 Form 10-Q) misleadingly led the investment community to believe that the Company's internal controls were well-functioning and were, in fact, being strengthened:

> An evaluation of internal controls was conducted for the year ended December 31, 2002.  The following paragraphs detail management's significant areas of focus to further enhance internal controls:
>
> o    The Company has implemented certain enhancements, or is in the process of enhancing, internal controls relating to data quality and process efficiency with respect to its current consolidation system and preparation of consolidated financial statements. Recent actions relate to improving the systematic roll-up of both financial and non-financial information that is reported in the Company's financial reports filed with the Securities & Exchange Commission.  These actions have primarily focused on improving; (1) the entity structure utilized by the consolidation tool, (2) the collection and compilation of financial and non-financial data, and (3) the ability to identify and eliminate intercompany transactions and balances in a more efficient manner.  The Company is currently making these changes to its existing consolidation system and is in the process of implementing a new consolidation system.  As part of the new system implementation process, the Company is examining additional means to improve its internal controls.  The Company is also enhancing its procedures with respect to ensuring timely and adequate review of

> non-standard journal entries and account reconciliations, and adherence to existing corporate accounting policies and accounting principles generally accepted in the United States of America.

> o   Further, the Company is implementing controls to ensure that financial and non financial information that is generated by accounting or other company functions is adequately reviewed prior to being recorded in the Company's books of record. As disclosed in Note 22 "Quarterly Financial Data," an error in the mathematical computation of foreign currency exchange gains was discovered and was reflected as a prior period adjustment in the third quarter 2002 financial statements. The error was detected as the result of a change in the individuals responsible for computing and reviewing the foreign currency exchange gain/loss. The Company is implementing new controls that are designed to improve the existing approval and authorization processes.

> Other than above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of the most recently completed evaluation. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements.

183. In connection with filing C&A's 2Q04 10-Q, defendants Stockman and Stepp executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Specifically, Stockman and Stepp certified that they were "responsible" for establishing and maintaining C&A's disclosure controls and procedures, and that they had:

> a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to C&A, including its consolidated subsidiaries, was made known to them by others within those entities;

> b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements for external purposes in accordance with generally
accepted accounting principles; and

c.    Evaluated the effectiveness of the Company's disclosure
controls and procedures and presented in the 2Q04 10-Q their
conclusions about the effectiveness of the disclosure controls and
procedures.

184.  Likewise, each of the Company's SEC filings for previous periods contained similar

Section 302 certifications regarding C&A's internal controls: (i) C&A's Form 10-Q for the First

Quarter of 2003 was certified by defendant Stepp; (ii) its Form 10-Q for the Second Quarter of

2003 was certified by defendants Stockman and Stepp; (iii) its Form 10-Q for the Third Quarter

of 2003 was certified by defendants Stockman and Stepp; (iv) its Form 10-K for the fiscal year

ended December 31, 2003 was certified by defendants Stockman and Stepp; and (v) its Form 1

A-Q for the First Quarter of 2004 was certified by defendants Stockman and Stepp.

185.  These statements were materially false and misleading. According to CI 2, during

the Class Period, C&A was suffering from a variety of material weaknesses over its internal

controls that were well known inside the Company. Indeed, C&A's internal control weaknesses

were reported to C&A management by the Company's auditors, but never disclosed to investors.

CI 2 stated that C&A failed in seven out of eight categories in the PricewaterhouseCoopers

review, and these failures, which included basic internal controls over things like accounts

receivables and payables recognition, were not rectified.  Defendants had actual knowledge of

C&A's substantial material weaknesses in internal controls and defendants' failure to correct

them.

### COLLINS & AIKMAN'S VIOLATION OF GAAP AND SEC RULES
### IN ITS FINANCIAL STATEMENTS AND PRESS RELEASES

186.  GAAP (FASB Statement No. 57, paragraph 15) notes that the reliability of financial

information involves "assurance that accounting measures represent what they purport to

represent."  It elaborates as follows:

Without disclosure to the contrary, there is a general presumption that transactions reflected in financial statements have been consummated on an arms-length basis between independent parties. However, that presumption is not justified when related party transactions exist because the requisite conditions of competitive, free-market dealings may not exist. Because it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent.

187.  Because of this GAAP (FASB Statement No. 57, paragraph 18) states that:

Information about transactions with related parties is useful to users of financial statements in attempting to compare an enterprise's results of operations and financial position with those of prior periods and with those of other enterprises. It helps them to detect and explain possible differences. Therefore, information about transactions with related parties that would make a difference in decision making should be disclosed so that users of the financial statements can evaluate their significance.

188.  In addition, GAAP (FASB Statement No. 57, paragraph 2) mandates that "financial statements shall include disclosures of material related party transactions" and that disclosures "shall" include:

A description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

189.  As noted in GAAP (FASB Statement No. 57, paragraph 8), "as part of Accounting Series Release No. 280, General Revisions of Regulation S-X, the Securities and Exchange Commission integrated the disclosure requirements...pertaining to related party transactions into Regulation S-X."

190.  In contravention of the requirements of the SEC and the provisions of FASB No. 57, the Company's financial statements which were disseminated to the investing public during the Class Period failed to comply with the foregoing GAAP. In this regard, although material (as the

term is defined in SEC Staff Accounting Bulletin No. 99 - "Materiality") amounts of related party rebate income was recognized by C&A throughout the Class Period, no documents filed with the SEC during the Class Period disclosed information which was necessary to an understanding of the effects of the related party transactions on the financial statements. Indeed, the restatements which were announced on March 17, 2005 and which might have served to belatedly provide this understanding never occurred. Significantly, the non-disclosed rebates emanated from transactions between C&A and McCallum, a director who signed the Company's 2002 and 2003 Form 10-K's knowing that the rebate income was concealed from the investment community. Similarly, Becker signed the Company's 2002 Form 10-K (which incorporated by the Company's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders) knowing that compensation which he received from C&A was concealed from the investment community.

191. GAAP (FASB Statement No. 5, paragraph 5) requires that an estimated loss "**shall** be accrued by a charge to income" (Emphasis added.) if both of the following conditions are met:

    (1)    Information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.

    (2)    The amount of the loss can be reasonably estimated.

192. At all relevant times, C&A had been locked into loss contracts for the production of products (thus impairing C&A's cash and inventory) and the amounts of such losses were reasonably estimable. GAAP (FASB Statement No. 5, paragraph 5) requires disclosure of the accrual when it is "necessary for the financial statements not to be misleading." In addition, where no accrual is made because one or both of the conditions above are not met, GAAP (FASB Statement No. 5, paragraph 10) requires that disclosure "**shall** be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or

range of loss or state that such an estimate cannot be made."  (Emphasis added.)  In contravention of this GAAP and SEC disclosure mandates, no documents filed with the SEC during the Class Period disclosed an accrual for contract losses, and they failed to provide the required disclosures which were necessary for C&A's financial statements and filings with the SEC not to be misleading.

193.  GAAP (Accounting Research Bulletin No. 43, chapter 4, paragraph 17) requires "recognition in a current period of losses arising from...firm, uncancelable, and unhedged commitments for the future purchase of inventory items" and it states that they should be "separately disclosed in the income statement."  At all relevant times, C&A had been locked into firm, uncancelable, and unhedged commitments for the future purchase of inventory items in connection with its loss contracts.  In contravention of GAAP, C&A neither recognized these losses for financial reporting purposes in the period in which the losses arose, nor separately disclosed these losses in income statements which were contained in any documents filed with the SEC during the Class Period.

194.  Additional GAAP, (Statement of Position 94-6, <u>Disclosure of Certain Significant Risks and Uncertainties</u> -- "SOP 94-6") is intended to inform the financial statement reader of any vulnerabilities arising due to the fact that the business is exposed to certain risks that might have a "severe impact" (defined in SOP 94-6 as: "A significant financially disruptive effect on the normal functioning of the entity" -- bankruptcy is a "severe impact").  Among other things, it requires disclosure of information that is adequate to inform users of financial statements of the nature of the company's operations and "the general nature of the risk associated with concentrations" in "business transacted with a particular customer, supplier, lender, grantor, or contributor," that make "the enterprise vulnerable to the risk of a near-term severe impact."

195. The Company's financial statements which were disseminated to the investing public during the Class Period failed to comply with the disclosure provisions of Statement of Position 94-6. In particular, these financial statements failed to disclose:

    a.    the existence, nature, and magnitude of C&A's loss contracts with DaimlerChrysler (C&A's largest customer) and other OEM's.

    b.    the impact of C&A's loss contracts with DaimlerChrysler and other OEM's on C&A's liquidity.

    c.    the general nature of the risk associated with concentrations in the volume of business transacted with DaimlerChrysler and other OEM's.

    d.    C&A's vulnerability to a severe impact as a result of "a" through "c" above.

196. Defendants' non-compliance with the foregoing GAAP (and with APB Opinion No. 22, which requires disclosure of accounting policies) was mirrored by defendants non-compliance with SEC disclosure mandates.

197. On May 18, 1989, the SEC issued an interpretive release (Securities Act Release No. 6835) which stated, in relevant part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:
>
> > The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

> As the Commission has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

198. SEC Staff Accounting Bulletin No. 101 ("SAB 101"), <u>Revenue Recognition in Financial Statements</u>, drawing from Regulation S-K, Article 303, and Financial Reporting Release 36, also reiterated the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

199. Item 7 of Form 10-K and Item 2 of Form 10-Q, requires the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable or unfavorable impact on net sales or revenues or income from continuing operations."

200. The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

201.  Thus, under these standards, the management of a public corporation must disclose in its periodic reports filed with the SEC, "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results.  17 C.F.R. § 229.303(a)(l)-(3) and Instruction 3.

202.  In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:  (a) A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management; and (b) is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

203.  As described herein, C&A's filings with the SEC during the Class Period failed to comply with MD&A disclosure requirements because the MD&A in each of these filings with the SEC:  (1) failed to disclose that the nature and magnitude of C&A's loss contracts with DaimlerChrysler and each of the other OEM's, the impact of these loss contracts on C&A's liquidity, the general nature of the risk associated with concentrations in the volume of business transacted with DaimlerChrysler and each of the other OEM's, and C&A's vulnerability to a severe liquidity crisis.  Moreover, despite the SEC mandate that the MD&A "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future," defendants failed to cause C&A to disclose the true foreboding nature of the Company's imminent future.

204. Nondisclosure of the foregoing was particularly significant for the Company's shareholders, because this nondisclosure deprived them of the ability to assess the true nature of

the Company's cash flow from operations and the likelihood of bankruptcy.  It is for precisely this reason that the SEC in SAB 101, citing the SEC's Financial Reporting Release 36, explained that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with **a particular emphasis on the registrant's prospects for the future."**  (Emphasis added.)

205.  Similarly, under Regulation S-K Item 303, Management's Discussion and Analysis of Financial Condition and Results of Operations, the SEC states that disclosure should focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  With respect to results or operations, the SEC states that management should:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in management's judgment, should be described in order to understand the results of operations; and Describe any known trends or uncertainties that have had or that management reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

206.  According to the SEC, these requirements are intended to provide in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on a company's prospects for the future.  Disclosure is mandatory where a known trend or uncertainty is reasonably likely to have a material effect on a company's financial condition or results of operations.

207. At all relevant times a "severe impact" (as the term is used in SOP 94-6) was imminent, although investors never had an inkling.  C&A's reported performance and future business prospects were, respectively, misreported and obscured by pervasive non-disclosures concerning the related party inflation of income, the improper inflation of income, the non-recognition of losses, and the non-disclosed loss contracts as discussed above.

208. The individual defendants, however, while concealing material adverse information from the investment community, seized the opportunity to funnel $303.5 million to related parties as follows:

    a.    $12.0 million (plus reimbursed for out-of-pocket expenses) to Heartland in 2001 in connection with its initial investment in C&A.

    b.    $100.0 million to McCallum and affiliates in 2001 in connection with the acquisition of Joan Automotive Industries, Inc. and Western Avenue Dyers, L.P.

    c.    $61.8 million to Becker and affiliates in 2001 in connection with the acquisition of Becker Group, LLC.

    d.    $12.5 million to Heartland in 2001 as a result of its advisory services in connection with the TAC-Trim acquisition.

    e.    $0.3 million to Becker in 2002 for his temporary service as Vice Chairman of the Company during that year;

    f.    $9.2 million to McCallum in 2002 in connection with the acquisition of a lamination company wholly owned by McCallum.

    g.    $57.8 million to entities controlled by Mr. McCallum in 2002 in "for goods and services purchased."

    h.    $4.2 million to Dutton Yarns (an affiliate of McCallum) for its air jet texturing business equipment, inventory and intellectual property.

    i.    $5.7 million to Heartland in 2002 for advisory services

    j.    $11.3 to Becker in 2003 in connection with termination of the non-compete agreement as discussed above.

k.    $4.7 million to Joan Fabrics (a company controlled by McCallum) in 2003 for equipment and for entering into a supply agreement with C&A whereby Joan Fabrics would perform certain marketing, design, customer service, distribution and sales functions.

l.    $4.0 million to Heartland in 2003 for advisory services

m.    $19.0 million to entities controlled by Mr. McCallum in 2003 in "for goods and services purchased."

n.    $1.0 million to Heartland in March 2004, for services rendered in connection with the 2004 amendments to the Company's credit facility.

209. During 2002, the Emerging Issues Task Force ("the EITF") became aware of a divergence in the manner in which companies were accounting for consideration received from a vendor in connection with the sale of the vendor's products, or for the promotion of sales of the vendor's products.

210. The EITF deliberated the issue and, on November 21, 2002, it reached a consensus ("EITF 02-16") which stated that such consideration received from vendors should be reflected as a decrease in prices paid for inventory and recognized in cost of sales as the related inventory is sold, unless very restrictive criteria was met which qualified the consideration for treatment as reimbursement of specific, identifiable incremental costs. Moreover, the EITF concluded that:

> ...a rebate or refund of a specified amount of cash consideration that is payable pursuant to a binding arrangement only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period should be recognized as a reduction of the cost of sales based on a systematic and rational allocation of the cash consideration offered to each of the underlying transactions that results in progress by the customer toward earning the rebate or refund provided the amounts are probable and reasonably estimable. If the rebate or refund is not probable and reasonably estimable, it should be recognized as the milestones are achieved.

211. This GAAP was required to be applied to new arrangements, including modifications of existing arrangements, entered into after December 31, 2002. It was also

required to be discussed in the Company's December 31, 2002 Form 10-K which was incorporated by reference into the March 31, 2003 Form 10-Q in observance of SEC Staff Accounting Bulletin 74 (Topic 11M) ("SAB 74").

212. SAB 74 mandates disclosure of the potential financial statement effects of the imminent adoption of recently issued accounting standards. It states that:

> The objectives of the disclosure should be to (1) notify the reader of the disclosure documents that a standard has been issued which the registrant will be required to adopt in the future and (2) **assist the reader in assessing the significance of the impact that the standard will have on the financial statements of the registrant when adopted...**The following disclosures should generally be considered by the registrant:
>
> o      A brief description of the new standard, the date that adoption is required and the date that the registrant plans to adopt, if earlier.
>
> o      A discussion of the methods of adoption allowed by the standard and the method expected to be utilized by the registrant, if determined.
>
> o      **A discussion of the impact that adoption of the standard is expected to have on the financial statements of the registrant, unless not known or reasonably estimable.  In that case, a statement to that effect may be made.**
>
> o      Disclosure of the potential impact of other significant matters that the registrant believes might result from the adoption of the standard (such as technical violations of debt covenant agreements, planned or intended changes in business practices, etc.) is encouraged.  (Emphasis added.)

213. Because the provisions of EITF 02-16 were to apply prospectively to financial statements for periods after December 31, 2002, the foregoing information concerning rebates received by C&A from vendors was required to be disclosed in the Company's 2002 Form 10-K.

214. Purporting to comply with the disclosure requirements of SAB 74, the Company's 2002 Form 10-K stated:

> New Accounting Pronouncements:
>
> In June 2002, the FASB issued SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities." This statement nullifies Emerging Issues Task Force (EITF) Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." This statement requires that a liability for a cost associated with an exit or disposal activity be recognized when the liability is incurred rather than the date of an entity's commitment to an exit plan. The Company is required to implement SFAS No. 146 on January 1, 2003. Management has not determined the impact, if any, that this statement will have on its consolidated financial position or results of operations.
>
> In November 2002, the FASB issued FASB Interpretation (FIN) No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN No. 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The Company is currently reviewing these recognition and measurement provisions, which are effective on a prospective basis for qualified guarantees issued or modified after December 31, 2002, to determine whether they will have a material impact on its consolidated financial statements. The disclosure requirements of FIN No. 45, which are effective for this quarter, are presented in the following paragraph.
>
> In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including products. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.
>
> In January 2003, the FASB issued FASB Interpretation No. 46 (FIN 46), "Consolidation of Variable Interest Entities, an interpretation of Accounting Research Bulletin No. 51, Consolidated Financial Statements." This interpretation provides guidance on the identification of variable interest entities, some of which may require consolidation based on factors beyond a majority voting interest. A variable interest entity is defined in FIN

46 as an entity in which either the equity investors (if any) do not have a controlling financial interest or the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. FIN 46 applies immediately to variable interest entities created after January 31, 2003, and in the first fiscal year or interim period beginning after June 15, 2003, to variable interest entities in which an enterprise holds a variable interest that it acquired before February 1, 2003. The company is currently unaware of any entities that exist that would qualify as a variable interest entity.

215. In contravention of SEC SAB 74, however, the Company's 2002 Form 10-K failed to:

a.  Notify the reader of the financial statements that EITF 02-16 had been issued.

b.  Provide a brief description of EITF 02-16, the date that adoption was required and the date that the Company planned to adopt the new standard.

c.  Assist the reader in assessing the significance of the impact that the standard would have on the financial statements of the Company when adopted, by providing a discussion of the impact that adoption of the standard was expected to have on the financial statements of the Company.

d.  Provide disclosure of the potential impact of other significant matters that might result from the adoption of the standard (such as technical violations of debt covenant agreements, planned or intended changes in business practices, etc.).

216. Disclosure of the impact of adopting EITF 02-16 (spreading rebate income over multiple reporting periods) would have forced the individual defendants to address the Company's accounting for rebates.  In this regard, the Company's financial statements would have had to discuss the accounting method applied during 2002, the changes that would occur subsequent to 2002, and the negative impact on the Company's financial statements. Such

disclosure would have had adverse consequences on the market price of the Company's stock and notes.

217.  In view of the fact that defendants provided SAB 74 disclosures for some of the recently promulgated accounting standards but not the one that would have significantly impacted reported earnings, there is a strong inference that the nondisclosure was intentional. This inference is supported by the fact that C&A's financial statements also failed to disclose its accounting policy for vendor rebates even though they were common in the automotive industry, in contravention of the disclosure requirements of APB Opinion No. 22, "Disclosure of Accounting Policies."   For these reasons, the above specified documents filed with the SEC during the Class Period were materially false and misleading.

218.  Insofar as they relate to rebates, the facts and circumstances present in this litigation are, at least in part, similar to those set forth in the SEC's Accounting And Auditing Enforcement Release No. 1393 (May 15, 2001), In the Matter of Sunbeam Corporation as follows:

> Beginning during the second quarter of 1997, Sunbeam began recording as income rebates obtained from suppliers that properly related to later period purchases.  As a result of aggressive negotiation by Sunbeam, four suppliers paid rebates in the second quarter in the total amount of $2.75 million. **Under GAAP, a rebate should normally be recorded as a reduction in cost of sales in the period in which its associated sale is made.** Con. 5, ¶ 85.  (Emphasis added.)

219.  SEC Regulation S-X requires that financial statements filed with the SEC conform with generally accepted accounting principles ("GAAP").  Financial statements filed with the SEC which are not prepared in conformity with GAAP are presumed to be misleading or inaccurate.  17 C.F.R. §210.401(a)(1).  The financial statements of the Company, which were disseminated to the investing public during the Class Period (which were represented as in

compliance with GAAP) were not only false and misleading for the reasons alleged above but also because they did not conform to additional other GAAP as specified below.

220. Financial statements filed in any documents with the Securities and Exchange Commission are required by Regulation S-X to conform to GAAP. The Company's financial statements which were included in the Company's public filings with the SEC during the Class Period were not prepared in accordance with GAAP because, among other things discussed above, the following GAAP were violated:

a.   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

b.   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1).

c.   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement Concepts No. 1).

d.   The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1).

e.    The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (Statement Of Financial Accounting Concepts No. 2).

f.    The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting. (FASB Statement of Concepts No. 2 )

g.    The principle of completeness, which means that  nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2)

h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2).

221.  The financial statements which were contained within the Company's press releases and filings with the SEC as particularized above were also not presented fairly in conformity with generally accepted accounting principles (AU Section 411) because the:

a.    accounting principles selected and applied in the preparation of the Company's financial statements did not have general acceptance or they were not appropriate in the circumstances.  In this regard, for example, the Company's financial statements failed to reflect losses on purchase commitments, contract losses, and rebate income as prescribed by GAAP.

b.    Company's financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation.  In this regard, for example, the Company's financial statements failed to disclose related party transactions, the nature and magnitude of the Company's loss contracts, and the nature of the risks associated with the Company's loss contracts as required by GAAP (SOP 94-6).

222. Because defendant Stockman personally negotiated the loss contracts with C&A's largest customers, and because they constituted the core of the Company's operations, all of the director and officer defendants could not avoid knowing of them, as well as the fact that they were concealed through fraudulent accounting and disregard of GAAP and SEC disclosure mandates.

223. The disclosures required by GAAP and the SEC are intended to clarify the investment community's understanding of the operations of the Company. As stated by the SEC in its Accounting Series Release No. 173: "it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations..."

224. As specified above, certain of the defendants not only failed to make any of the disclosures required by GAAP, they falsely represented that the Company's financial statements were in full compliance with GAAP by signing certifications pursuant to the requirements of the Sarbanes-Oxley Act of 2002 which stated that the Company's SEC filings did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and that the financial statements, and other financial information included in the SEC filings, fairly presented in all material respects the financial condition, results of operations and cash flows of the Company.

225. Defendants were required to cause the Company to disclose, in its financial statements, the existence of the material facts described herein and to appropriately recognize and report revenues and expenses in conformity with GAAP. Each of the defendants made materially false and misleading statements as particularized above, concealed the material facts described

above, and approved the dissemination of financial statements and periodic filings with the SEC which failed to comply with the accounting and disclosure requirements of GAAP.  Plaintiff personally relied upon defendants representations as set forth in press releases, as expressed during conference calls, and as embodied in financial statements and periodic filings with the SEC.  Plaintiff's reliance caused Plaintiff to suffer damages.

226. C&A's 2002 Form 10-K which was incorporated by reference into each of C&A's filings on Form 10-Q during 2003 stated:

> Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

227. A substantially similar representation appeared in C&A's 2003 Form 10-K which was incorporated by reference into each of C&A's filings on Form 10-Q during 2004.

228. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the foregoing "risk" disclosures during the Class Period as pleaded in this Complaint because the statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  These include the concealed material loss contracts which assured losses of no less than $50 million per year and which were known to exist by the defendants, the scope of the pervasive accounting irregularities, and the magnitude of the impact of such irregularities on the Company's reported earnings, operating income, and EBITDA, and its ability to continue as a going concern.

229.  In addition, to the extent certain other statements alleged above to be false may be characterized as forward looking, they either were not sufficiently identified as "forward-looking statements" when made, or were improperly so classified when in fact the material, adverse, conditions already had materialized.

230.  As noted above, C&A has admitted that its previously issued financial statements during the Class Period are required to be restated.

231.  On January 31, 2002, the SEC, the ultimate authority regarding GAAP and matters of financial reporting (SEC Accounting Series Release Nos. 4 and 150), submitted an Amicus Curiae Brief (In Re:  Sunbeam Securities Litigation, 98-8258-Cic. – Middlebrooks, S.D. FL, Miami Div.) which unequivocally stated its position with regard to financial statements as follows:

> ". . . corrected financial statements are highly probative of at least two of the elements of a private action under the federal securities laws:  whether there was a misstatement in the original financial statements and whether the misstatement was material.  See, e.g., In re Telxon Corp. Secs. Litig., 133 F. Supp. 2d 1010, 1025 (N.D. Ohio 2000) (when ruling on defendants' motion to dismiss action under PSLRA, court held that company defendant was not in a position to dispute that it misstated material facts in its financial disclosures because company admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to the litigation) (citing In re Peritus Software Servs., Inc. Secs. Litig., 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("after the fact accounting admissions may suffice to show that material misstatements occurred")).  **Restated financial statements are probative of these two issues because under GAAP they cannot be filed unless the original financial statements contained material errors as defined in GAAP.  See pages 11-12, above. Thus, under GAAP, restated financial statements must constitute an admission of past errors . . . By filing restated financial statements with the Commission, a company announces that it had previously materially misstated its financial condition or its results of operations.  This exposes it to a high risk of civil and criminal investigations and legal actions by the federal government . . ."** (Emphasis added.)

232. There is no question that by announcing that C&A was required to file restated financial statements with the SEC, the individual defendants announced that they had previously disseminated materially misstated financial statements to the investing public. In addition, based upon all of the foregoing, there is also no question that the individual defendants either had contemporaneous actual knowledge that these previously issued financial statements were materially misstated or recklessly failed to have such knowledge.

## ADDITIONAL SCIENTER ALLEGATIONS

233. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. For example, defendant Stockman personally directed the mischaracterization of operating expenses as non-operating or capital expenditures. He also personally negotiated money-losing arrangements with DaimlerChrysler which were not disclosed.

234. C&A changed auditors suspiciously, in a way that raises an inference of scienter. C&A was historically audited by Arthur Andersen, which ceased auditing public companies after its criminal conviction in the Enron matter. C&A then went to PricewaterhouseCoopers, which audited the 2002 financial statements. However, having opined on only one year's statements, PricewaterhouseCoopers withdrew in the Summer of 2003 after sending a letter to Company's audit committee and management which described "reportable conditions" (June 26, 2003 Form 8-K). C&A took on KPMG as an auditor for its 2003 financial statements, reported in March, 2004.

235. During the Class Period, C&A's audit committee conducted an internal investigation that examined related party transactions (as described above) which included vendor rebates, and required further disclosure of those transactions in March 2004. Despite looking directly at vendor rebates, the Company did not then disclose that more than 10% of its vendor rebates were improperly accounted for, a fact C&A concealed for a further year.

236. Defendants' scienter is further established by their efforts to mislead the investing public near the end of the Class Period to mitigate the effects of the disclosure. In a further effort to convince investors that the issues identified in the March 17, 2005 press release would not have a materially negative impact on C&A's future performance, defendants announced that Heartland had entered into an agreement to purchase approximately $300 million face value of C&A preferred stock from Textron Inc. ("Textron"). This announcement was designed to convince debt investors that defendants continued to have complete confidence in C&A's financial health and viability. Indeed, during the March 17, 2005 conference call, defendant Stockman stated:

> We remain convinced that we have a business model that can work, and that we have a place in the industry where we can thrive economically and in terms of our earnings and cash flow over time. For that reason, Heartland Industrial Partners, of- of which I am the founding partner, as you know, has reached an agreement in recent days with Textron, that owns all of our preferred stock, that it got at the time of the original transaction. Face value today is around $300 million. We've reached an agreement to buy a majority of that stock, and an option on the rest, at a total price of around $45 million. So we will be able to take control of all of the equity, the preferred equity, and our position in the common, but the preferred equity for about $45 million, or 15, 16 percent of its liquidation value. We see that as a very strong vote of confidence in our future as a company and in the strategies and initiatives we're going to talk about now that we're undertaking to deal with some very unprecedented and some very unusual circumstances.

237. In reality, however, Heartland's so-called "commitment" to purchase C&A preferred stock from Textron was a ruse designed to bolster investor confidence in C&A without actually

obligating Heartland to purchase any shares of the Company. Defendants did not disclose that, under the terms of the agreement between Textron and Heartland, Heartland had no obligation to purchase Textron's shares until C&A filed a Form 10-K for 2004 (which it still has not done). Moreover, Heartland could unilaterally terminate the agreement if C&A did not file a Form 10-K for 2004 by December 31, 2005, or if C&A experienced an event of bankruptcy or insolvency. In other words, unbeknownst to the market, rather than show "confidence" in C&A, Heartland had hedged its bets.

**Further Allegations Of Motive**

238. Defendants were motivated to, and did, mislead the investing public because they had a motive to conceal C&A's dire financial straits during the Class Period. Heartland and its handpicked management team injured C&A's long-term cash flow with factoring arrangements that accelerated payment; created quality problems that postponed payment on major contracts; and engaged in related-party transactions that funneled hundreds of millions to Heartland and its partners and affiliates. Having so injured C&A, defendants attempted to sell stock to the public in the Summer of 2002 to shore up the Company's cash position. This offering failed, however. From that point on, defendants were in search of an exit strategy to permit them to either turn C&A around, or protect themselves from a loss if it were to collapse. In order to do that, defendants had to preserve C&A's access to capital, both to operate and to pay debt. For example, C&A owed $400 million on maturing bonds in 2006. Continued access to financing required C&A to conceal from lenders and the bond market that the Company was in trouble. For example, defendants were motivated to engage in this course of conduct in order to (i) complete an offering of $415 million in aggregate principal amount of its senior subordinated notes; and (ii) enter into a new credit facility on more favorable terms.

239. Defendants Stockman and Stepp were personally motivated to hide C&A's problems because their jobs and personal fortunes were at stake. Stockman was the founder of Heartland and the CEO of C&A, and he had personal wealth tied up in both. If he were to reveal the problems with C&A during the Class Period, he stood to (1) lose his job; (2) lose his position at the head of Heartland; and (3) lose a great deal of personal wealth. In the event, when C&A could no longer be propped up, all three of these things came to pass. Stockman was fired and replaced with another Heartland insider at C&A; he lost control of Heartland to two of his colleagues; and his personal holdings in C&A became virtually worthless.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

240. At all relevant times, the market for C&A securities was an efficient market for the following reasons, among others:

(o)    C&A's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(p)    As a regulated issuer, C&A filed periodic public reports with the SEC and the NYSE;

(q)    C&A regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(r)    C&A was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(s)    C&A fixed income securities were rated by the three major credit rating agencies, Standard & Poors, Moody's and Fitch.    Credit analysts followed C&A's creditworthiness; and

(t)    10-3/4% Notes were registered with the SEC and traded publicly throughout the Class Period.  Investors in these Notes further had available to them the price of C&A common stock.  C&A Notes, as demonstrated by their precipitous drop at the end of the Class Period, reacted rapidly to material new information about the Company.

241. As a result of the foregoing, the market for C&A's securities promptly digested current information regarding C&A from all publicly available sources and reflected such information in C&A's stock price. Under these circumstances, all purchasers of C&A's securities during the Class Period suffered similar injury through their purchase of C&A's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

242. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of C&A who knew that those statements were false when made.

## LOSS CAUSATION

243. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of C&A's securities and operated as a fraud or deceit on Class Period purchasers of C&A securities by misrepresenting the Company's financial and business performance and future business prospects. Defendants achieved this facade of success, growth and strong future business prospects, and concealed C&A's serious financial problems by blatantly misrepresenting the Company's results and business prospects. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, prices for C&A securities fell precipitously as the prior artificial inflation was removed from C&A's securities.

244. C&A successfully concealed its accounting problems until March 17, 2005, when it conceded that it would need to restate its 2003 and 2004 performance. On that day, the stock dropped substantially as a result of the disclosures. The resulting losses by Class members are attributable to the Company's materially misleading financial results.

245. C&A securities also suffered significant decreases in value during the early months of 2005 and up to May 17, 2005. These decreases were the result of the materialization of the effects of the adverse business developments that the Company had concealed during the Class Period, and of the materialization of the adverse conditions concealed by C&A's accounting improprieties during the Class Period. When the consequences of, inter alia, the Company's reduced cash flow, money-losing contracts and quality problems finally became

unavoidable, C&A was forced into bankruptcy and its securities dropped substantially in value, thereby injuring the members of the Class.

246.  Defendants' false and misleading statements had the intended effect and caused C&A securities to trade at artificially inflated levels throughout the Class Period.  As a result of their purchases of C&A securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLAIMS ALLEGED

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Individual Defendants

247.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

248.  During the Class Period, the individual defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding C&A's business, operations, management and the intrinsic value of C&A common stock; (ii) enable the Company to complete an offer of $415 million in aggregate principal amount of its senior subordinated notes; (iii) enable the Company to enter into a new credit facility on more favorable terms than it would have had the truth been known; and (iv) cause plaintiff and other members of the Class to purchase C&A's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

249.  The individual defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort

to maintain artificially high market prices for C&A's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The individual defendants are sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

250. The individual defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of C&A as specified herein.

251. The individual defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of C&A's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about C&A and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of C&A securities during the Class Period.

252. The individual defendants' primary liability, and controlling person liability, arises from the following facts: (i) these defendants were high-level executives (Defendants Stockman and Stepp were also Chairman and Vice Chairman, respectively, of the Company) at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) defendants, by virtue of their responsibilities and activities as a senior officers and/or directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) these

defendants enjoyed significant personal contact and familiarity with the other controlling persons of the Company and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) these defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

253. The individual defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The individual defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing C&A's operating and reporting condition and future business prospects from the investing public and to create and supporting the artificially inflated price of its securities. As demonstrated by the individual defendants' overstatements, misstatements and omissions regarding the Company's business, its business prospects and the financial health of the Company, throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

254. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of C&A's securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of C&A's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the individual defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information

that was known to or recklessly disregarded by the individual defendants but not disclosed in public statements by the individual defendants during the Class Period, plaintiff and the other members of the Class acquired C&A securities during the Class Period at artificially high prices and were damaged thereby.

255.  At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth with regard to the distribution, adoption, and integration of its products, which were not disclosed by any defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their C&A securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

256. By virtue of the foregoing, these defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

257.  As a direct and proximate result of the individual defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation Of Section 20(a) Of The
Exchange Act Against The Individual Defendants**

258.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

259.  The individual defendants acted as controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with

the SEC and disseminated to the investing public, the individual defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The individual defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

260. In particular, the individual defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

261. As set forth above, C&A and defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation Of Section 20(a) Of The
### Exchange Act Against Heartland

262. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

263. Heartland acted as controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its majority ownership, control of voting

rights, the presence of Heartland-affiliated persons in a majority of the board positions, its placement of Heartland-affiliated persons in senior management roles including CEO and CFO, its role in providing C&A's CEO without salary pursuant to an advisory contract, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Heartland had and exercised the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Heartland was provided with or had unlimited access to, through Stockman, Stepp, and others, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

264. In particular, Heartland had direct and supervisory involvement in the day-to-day operations of the Company through its board members and senior management and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

265. As set forth above, C&A and the individual defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its position as a controlling person, Heartland is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Heartlands' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action, designating plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of plaintiff and the other Class members against defendants, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 13, 2006                    Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By: _____
Fred T. Isquith, Esq. (FI 6782)
Gregory M. Nespole, Esq. (GN 6820)
Thomas H. Burt, Esq. (TB 7601)
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

**GAINEY & McKENNA**
Thomas J. McKenna
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**Attorneys for Plaintiff**

113

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE COLLINS & AIKMAN CORPORATION
SECURITIES LITIGATION

1:05-cv-03791 (MBM)

## CERTIFICATE OF SERVICE

I, James A. Cirigliano, hereby certify that on the 13th day of January, 2006, I caused to

be served a true and correct copy of the Consolidated Class Action Complaint via Federal

Express upon the following counsel for defendants in the above-captioned litigation:

**BLANK ROME LLP**
Michael Joseph, Esq.
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 772-5959

**CAHILL GORDON & REINDEL LLP**
David G. Januszewski, Esq.
80 Pine Street
New York, NY 10005
(212) 701-3352

**SULLIVAN & CROMWELL LLP**
Gandolfo V. DiBlasi, Esq.
125 Broad Street
New York, NY 10004
(212) 558-3836

**WILMERHALE LLP**
Lori A. Martin, Esq.
399 Park Avenue
New York, NY 10022
(212) 295-6412

Dated:  January 19, 2006

_____
James A. Cirigliano

/426714